# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION


EDDIE WAYNE DAVIS,

     Petitioner,

v.                                      CASE NO. 8:04-cv-2549-T-27MAP

WALTER A. MCNEIL, Secretary,
Florida Department of Corrections,

     Respondent.

_____/

## O R D E R

This cause is before the Court on Petitioner Eddie Wayne Davis's (hereinafter "Petitioner" or "Davis") petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (hereinafter "petition") (Dkt. 1). Petitioner is a Florida prisoner under sentence of death. Petitioner filed a memorandum in support of the petition (hereinafter "memo") (Dkt. 2). Respondent filed a response to the petition (Dkt. 18), and Petitioner filed a reply to the response (Dkt. 21). Upon consideration of each of Petitioner's claims, the Court has determined that none have merit and that Petitioner's request for federal habeas relief (Dkt. 1) is DENIED.

## BACKGROUND

Petitioner was convicted in 1995 of first-degree murder, burglary with assault, kidnapping of a child under 13, and sexual battery on a child. He was sentenced to death. Petitioner's convictions and sentence were affirmed by the Florida Supreme Court on June 5, 1997. *See Davis v. State*, 698 So.2d 1182 (Fla. 1997), *cert. denied*, 522 U.S. 1127 (1998). Petitioner initiated state

court post-conviction proceedings in 1998. In October 2001, an evidentiary hearing was held on a number of Petitioner's claims. In June 2002, the state trial court denied Petitioner's post-conviction motion. On November 20, 2003, the Florida Supreme Court affirmed the denial of Petitioner's post-conviction motion. *See Davis v. State*, 875 So.2d 359 (Fla. 2003). The Florida Supreme Court's mandate issued on July 6, 2004.

**FACTS**[1]

On the afternoon of March 4, 1994, police found the body of eleven-year-old Kimberly Waters in a dumpster not far from her home. She had numerous bruises on her body, and the area between her vagina and anus had been lacerated. An autopsy revealed that the cause of death was strangulation.

On March 5, police questioned Davis, a former boyfriend of Kimberly's mother, at the new residence where he and his girlfriend were moving. Davis denied having any knowledge of the incident and said that he had been drinking at a nearby bar on the night of the murder. Later that same day police again located Davis at a job site and brought him to the police station for further questioning, where he repeated his alibi. Davis also agreed to and did provide a blood sample.

While Davis was being questioned at the station, police obtained a pair of blood-stained boots from the trailer Davis and his girlfriend had just vacated. Subsequent DNA tests revealed that the blood on the boots was consistent with the victim's blood and that Davis's DNA matched scrapings taken from the victim's fingernails. A warrant was issued for Davis's arrest.

---

[1]The facts are taken from the Florida Supreme Court's opinion affirming Petitioner's convictions on direct appeal. *Davis v. State*, 698 So.2d 1182 (Fla. 1997).

On March 18, Davis agreed to go to the police station for more questioning. He was not told about the arrest warrant. At the station, he denied any involvement and repeated the alibi he had given earlier. After about fifteen minutes, police advised Davis of the DNA test results. Davis insisted they had the wrong person and asked if he was being arrested. Police told him that he was. At that point Davis requested to contact his mother so she could obtain an attorney for him, and the interview ceased. Davis was placed in a holding cell.

A few minutes later, while Davis was in the holding cell, Major Grady Judd approached him and, making eye contact, said that he was disappointed in Davis. When Davis responded inaudibly, Judd asked him to repeat what he had said. Davis made a comment suggesting that the victim's mother, Beverly Schultz, was involved. Judd explained that he could not discuss the case with Davis unless he reinitiated contact because Davis had requested an attorney. Davis said he wanted to talk, and he did so, confessing to the crimes against Kimberly and implicating Beverly Schultz as having solicited the crimes. Within a half hour after this interview, police conducted a taped interview in which Davis gave statements similar in substance to the untaped confession. Davis's full Miranda warnings were not read to him until the taped confession began.

In May, 1994, Davis wrote a note asking to speak to detectives about the case. In response, police conducted a second taped interview on May 26, 1994. Police asked Davis if he was willing to proceed without the advice of his counsel, to which Davis responded yes, but specific Miranda warnings were not recited to Davis. During this interview, Davis again confessed to killing Kimberly but stated that Beverly Schultz was not involved. Davis explained that he originally went to Schultz's house to look for money to buy more beer. Because Schultz

normally did not work on Thursday nights and because her car was gone, Davis believed that no one was home. Indeed, Schultz was not home at the time because she had agreed to work a double shift at the nursing rehabilitation center where she was employed. However, her daughters, Crystal and Kimberly, were at the house sleeping. When Davis turned on the lights in Beverly Schultz's bedroom, he saw Kimberly, who was sleeping in Schultz's bed. Kimberly woke up and saw him. He put his hand over her mouth and told her not to holler, telling her that he wanted to talk to her. Kimberly went with him into the living room. Davis put a rag in her mouth so she could not yell.

Davis related that they went outside and jumped a fence into the adjacent trailer park where Davis's old trailer was located. Davis said that while they were in the trailer, he tried to put his penis inside of Kimberly. When he did not succeed, he resorted to pushing two of his fingers into Kimberly's vagina. Afterwards, Davis took Kimberly to the nearby Moose Lodge. He struck her several times, then placed a piece of plastic over her mouth. She struggled and ripped the plastic with her fingers but Davis held it over her mouth and nose until she stopped moving. He put her in a dumpster and left.

Davis moved to suppress the March 18 and May 26 statements he made to law enforcement officers, arguing that his Miranda rights were violated. The trial court denied those motions. The jury found Davis guilty of first-degree murder, burglary with assault or battery, kidnapping a child under thirteen years of age, and sexual battery on a child under twelve years of age. The jury unanimously recommended a sentence of death and the trial court sentenced Davis to death.

In aggravation, the trial court found that the murder was: (1) committed by a person under

4

sentence of imprisonment; (2) committed during the commission of a kidnapping and sexual battery; (3) committed for the purpose of avoiding or preventing a lawful arrest; and (4) especially heinous, atrocious, or cruel. As statutory mitigation, the court found that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance and gave this factor great weight.

As nonstatutory mitigation, the court found that Davis was capable of accepting responsibility for his actions and had shown remorse for his conduct and offered to plead guilty; that he had exhibited good behavior while in jail and prison; that he had demonstrated positive courtroom behavior; that he was capable of forming positive relationships with family members and others; that he had no history of violence in any of his past criminal activity; that he did not plan to kill or sexually assault the victim when he began his criminal conduct; that he cooperated with police, confessed his involvement in the crime, did not resist arrest, and did not try to flee or escape; that he had always confessed to crimes for which he had been arrested in the past, accepted responsibility, and pled guilty; that he had suffered from the effects of being placed in institutional settings at an early age and spending a significant portion of his life in such settings; and that Davis obtained his GED while in prison and participated in other self-improvement programs. Although the trial court gave "medium weight" to several of these nonstatutory mitigators, most of them were assigned little weight.

**STANDARDS OF REVIEW**

Because Davis filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90

(11th Cir. 2003); *Maharaj v. Sec'y of Dept. of Corrections*, 304 F.3d 1345, 1346 (11th Cir. 2002). The ultimate issue with respect to each claim is whether the Florida Supreme Court's resolution of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). *Williams v. Taylor*, 529 U.S. 362 (2000); *Robinson v. Moore*, 300 F.3d 1320 (11th Cir. 2002); *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318 (11th Cir. 2002). The standard Davis must meet could not be higher; it is not enough that the state court "got it wrong." Davis must show that the result of the state court's decision was objectively unreasonable. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor, supra*).

In the event constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). The test is "less onerous" then the harmless error standard enunciated in *Chapman v. California*, 386 U.S. (1967). "The test is whether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637. Although no constitutional error has occurred in Davis's case, any possible error would be harmless beyond any reasonable doubt based on the facts and the record herein.

No evidentiary hearing is required because none of Davis's claims turn on any unresolved issue of fact; all involve issues of law argued on the basis of the existing record.[2]

---

[2]The state trial court conducted an evidentiary hearing. Its findings are "presumed to be correct" (28 U.S.C. § 2254(e)(1)) and there is no showing that its decision "was based on an unreasonable determination of the facts. . ." (28 U.S.C. § 2254(d)(2)).

**Ineffective Assistance of Counsel Standard**

To prevail on a claim of ineffective assistance of trial or appellate counsel, a Petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland*'s two-part test requires a Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

**DISCUSSION**

GROUND ONE

Davis was denied his due process rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution because in the penalty phase of the trial counsel failed to request that the court inquire, and the court failed to conduct an inquiry of Davis as to whether he wanted to take the witness stand to testify in his own behalf (Petition, pp. 10-12 (Doc. 1); Memo, pp. 6-13 (Doc. 2)).[3]

Davis did not testify during the penalty phase of the trial.[4]  He alleges that he was unaware that he had the ultimate right to decide whether or not to testify at the penalty phase of the trial, and that counsel failed to inform him of his right to testify during the penalty phase.  He argues that he did not knowingly, intelligently, and voluntarily waive his right to testify at the penalty phase.  He also argues that trial counsel was ineffective in waiving his right to testify at the penalty phase without consulting with him, and for failing to ask the trial court to inquire of

_____

[3]Davis's claim is that his trial attorneys were ineffective in failing to request a trial court colloquy to determine that Davis knowingly and voluntarily waived his right to testify at the guilt phase of the trial.

[4]Davis expressly waived his right to testify during the guilt phase of the trial (A17, 2009).

Davis as to whether he wanted to testify.  Furthermore, Davis argues that the trial court committed fundamental error for failing to conduct a colloquy or inquire of Davis whether he wanted to testify at the penalty phase.  Finally, Davis argues that his appellate counsel provided ineffective assistance for failing to raise the issue of the denial of Davis's right to testify at the penalty phase.[5]

Davis raised this claim in his state 3.850 post-conviction motion.  In denying the claim, the state trial court stated:

> Davis contends that trial counsel did not request the Court to inquire of the Defendant as to whether he wanted to testify in the penalty phase. Davis contends he could have testified in the penalty phase as to his state of mind at the time of the killing, as well as his fear and anxiety of homosexual rape and sexual abuse.

[5]Respondent argues that to the extent Davis asserts it was fundamental error for the trial court to allow counsel to waive Davis's right to testify and to fail to conduct a colloquy or to inquire of Davis as to whether he wanted to testify, the claims are unexhausted and procedurally barred because Petitioner failed to fairly present the claims to the state courts. Having reviewed Petitioner's appellate briefs, this Court agrees in part and disagrees in part.  "[A] petitioner must present his claims to the state court 'such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation.'" *Darity v. Sec'y, Dep't of Corr.*, 2009 U.S. App. LEXIS 196 at *2-3 (11th Cir. Jan. 8, 2009)(quoting *Kelly v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004)).  Davis sufficiently exhausted his claim that it was fundamental error for the trial court to allow counsel to waive Davis's right to testify by raising the claim in his Initial Brief on appeal of the denial of his post-conviction motion (C6, 31-32).  Davis did not, however, raise his claim that it was fundamental error for the trial court to fail to conduct a colloquy or inquire of Davis as to whether he wanted to testify (C6, 30-41). Habeas petitioners generally cannot raise claims in federal court if those claims were not first exhausted in state court. 28 U.S.C. § 2254(b)(1); *Kelley*, 377 F.3d at 1343-44. The state's rule precluding a successive Rule 3.850 motion bars Davis's returning to state court to present a second Rule 3.850 motion. See Fla. R. Crim. P. 3.850(b). Davis fails to demonstrate cause and prejudice excusing his default. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  Davis has neither alleged nor shown that the fundamental miscarriage of justice exception applies. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). Because Davis fails to proffer specific facts showing an exception to procedural default, *Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996), his claim that it was fundamental error for the trial court to fail to conduct a colloquy or to inquire of him as to whether he wanted to testify is procedurally barred from federal review.

Davis relies on *Deaton v. Dugger*, 635 So. 2d 4 (Fla. 1993).

  In <u>Deaton</u> the trial judge concluded that because his counsel failed to adequately investigate mitigation, Deaton's waiver of his right to testify and call witnesses was not knowingly, voluntarily and intelligent. Here, trial counsel did call witnesses and present sufficient mitigation evidence. Additionally, there was no testimony presented that Davis affirmatively requested to testify in the penalty phase, and his attorneys failed to call him as a witness. During the guilt phase, the Court did inquire of the Defendant whether he wanted to testify, and made Defendant aware that whether or not to testify was completely his decision. ®. at 2009). Based on the above factors, this claim is DENIED.

(C5, 707).

  In affirming the denial of this claim, the Florida Supreme Court stated:

In his first claim of penalty phase ineffectiveness, Davis argues that trial counsel was ineffective in failing to obtain an on-the-record waiver by Davis of his right to testify in the penalty phase of trial. In *Torres-Arboledo v. State*, 524 So. 2d 403, 410 (Fla. 1988), the Court addressed whether due process required that the trial court obtain from the defendant an on-the-record waiver of the right to testify in the guilt phase. The Court stated:

> Although we agree that there is a constitutional right to testify under the due process clause of the United States Constitution, . . . this right does not fall within the category of fundamental rights which must be waived on the record by the defendant himself. We view this right to be more like an accused's right to represent himself. Although such a right has been expressly recognized by the United States Supreme Court . . . this right has not been considered so fundamental as to require the same procedural safeguards employed to ensure that a waiver of the right to counsel is knowingly and intelligently made.

Id. at 410-11. In *Torres-Arboledo,* the Court relied in part on *Cutter v. State*, 460 So. 2d 538 (Fla. 2d DCA 1984), where the Second District stated that the right to testify may be waived by the defendant's attorney "in the absence of express disapproval on the record by the defendant during the pretrial or trial proceedings." *Cutter*, 460 So. 2d at 539; *See Torres-Arboledo*, 524 So. 2d at 410 (expressly approving *Cutter*); *see also Occhicone v. State*, 570 So. 2d 902, 905 (Fla. 1990) (relying on *Torres-Arboledo* to hold that the trial court did not err in

not telling *Occhicone* specifically that he had the right to testify on his own behalf). The standard adopted in *Torres-Arboledo* applies to the defendant's right to testify at both the guilt and penalty phase. *See Lawrence v. State*, 831 So. 2d 121, 132 (Fla. 2002).

In this case, the trial court obtained from Davis an on-the-record waiver of his right to testify in the guilt phase, in which Davis affirmatively participated. In securing this waiver, the trial court inquired as to whether Davis wanted to testify and made Davis aware that whether or not to testify was his decision. In the penalty phase, defense counsel indicated that his client would not be testifying. Davis did not testify during the postconviction evidentiary hearing that he disagreed with counsel's waiver. Nor does Davis assert that he was otherwise prevented by counsel from testifying. In fact, his defense counsel stated that the subject of whether Davis would testify in the penalty phase was discussed with Davis. Therefore, because the record affirmatively shows that our holding in *Torres-Arboledo* was not violated, Davis's counsel was not ineffective in failing to obtain an on-the-record waiver by Davis of his right to testify in the penalty phase.

Moreover, Davis has not established prejudice under the second prong of *Strickland*. Because Davis did not testify at the evidentiary hearing or otherwise establish what testimony he would have offered, we cannot conclude that our confidence in the outcome is undermined by Davis's failure to testify during the penalty phase. Therefore, we affirm the trial court's denial of relief on this claim.

*Davis v. State*, 875 So. 2d at 368-69.

In affirming the denial of Davis's ineffective assistance of appellate counsel claim, the

Florida Supreme Court stated:

In his first habeas claim, Davis argues that his appellate counsel was ineffective for failing to raise on direct appeal the failure of the trial court to obtain an on-the-record waiver by Davis of his right to testify at the penalty phase. Because we have determined that neither the trial court nor counsel erred in not obtaining an on-the-record waiver from Davis, Davis's claim that appellate counsel was ineffective for failing to raise this issue on appeal is without merit.

*Davis v. State*, 875 So. 2d at 373.

A criminal defendant has a fundamental constitutional right to testify on his own behalf at

trial, a right that cannot be waived by defense counsel. *United States v. Teague*, 953 F.2d 1525,

1532 (11th Cir. 1992) (en banc). The appropriate vehicle for claims that a defense counsel's acts led to a violation of this right is an ineffective assistance of counsel claim. *Id*. at 1534. Davis asserts that his counsel were ineffective in failing to ensure that the trial court obtained an on-the-record waiver of Davis's right to testify in the penalty phase of the trial. The Eleventh Circuit has, however, rejected the argument that "whenever a criminal defendant does not testify at trial there is a *per se* requirement that the district court advise the defendant of his right to testify and conduct an on-the-record inquiry into whether a non-testifying defendant knowingly, voluntarily, and intelligently waived the right to testify." *United States v. Van De Walker*, 141 F.3d 1451, 1452 (11th Cir. 1998). Therefore, because the trial court was not required to conduct a colloquy and obtain an on-the-record waiver from Davis of his right to testify during the penalty phase, Davis cannot show that counsels' performance was deficient in failing to ensure that the trial court obtained an on-the-record waiver.

Davis also asserts that counsel provided ineffective assistance in waiving his right to testify during the penalty phase. Where defense counsel has not informed the defendant of his right to testify, defense counsel "has not acted within the range of competence demanded of attorneys in criminal cases." *Gallego v. United States*, 174 F.3d 1196, 1197 (11th Cir. 1999) (citations and internal quotations omitted). This claim is also without merit.

The state courts found that Attorney Maslanik did discuss with Davis his right to testify during the penalty phase of the trial. During the post-conviction evidentiary hearing when asked if he ever had talked to Davis about testifying in the penalty phase, Attorney Maslanik answered "Yes, I had." (C4, 511). Attorney Maslanik also testified that he and Davis discussed what Davis would tell the jury about his life, and how he felt about the victim's death (C4, 512).

Davis did not testify at the post-conviction evidentiary hearing. He does not allege that he told his attorneys that he wanted to testify during the penalty phase, and that his attorneys refused to allow him to testify. In fact, Davis does not even allege that he wanted to testify at the penalty phase, or that he would have testified. Therefore, the record supports the Florida Supreme Court's finding that counsel informed Davis of his right to testify during the penalty phase. The state courts' finding that Davis's attorney discussed with Davis whether he would testify in the penalty phase was not an unreasonable determination of the facts in light of the evidence presented. Davis has not rebutted the State courts' factual finding by clear and convincing evidence. Accordingly, Davis fails to establish that his attorneys provided ineffective assistance in failing to discuss with him his right to testify during the penalty phase before waiving that right.[6]

Furthermore, Davis fails to show prejudice. Davis must establish deficient performance and prejudice to obtain relief. *Strickland*, 466 U.S. at 687; *Teague*, 953 F.2d at 1535. To prove prejudice, a movant must show that there is a reasonable probability that the outcome would have been different but for counsel's unprofessional errors. *Strickland*, 466 U.S. at 694. In his petition, Davis avers that he could have testified regarding the childhood sexual abuse and prison rape he experienced, and that his testimony on those matters would have had a greater impact on the jury than the testimony of the mental health experts who testified regarding the abuse he suffered. He also avers that he could have expressed his remorse as could no other witness.

---

[6]With regard to the portion of the claim asserting that it was fundamental error for the trial court to allow counsel to waive Davis's right to testify, the claim is without merit. The record supports the state courts' findings that counsel did discuss with Davis his right to testify during the penalty phase, and that Davis never testified during the state post-conviction evidentiary hearing that he disagreed with counsel's waiver or that he wanted to testify.

During the penalty phase, Davis's attorneys presented extensive mitigating evidence on his behalf, including testimony from three mental health experts who described the abuse Davis had suffered. Despite the extensive mitigating evidence presented on Davis behalf, the jury unanimously recommended the death sentence. Davis's proposed testimony, in light of both parties' evidence, does not demonstrate a reasonable probability that the trial's outcome would have been different. Moreover, as the Florida Supreme Court acknowledged, Davis did not testify during the post-conviction hearing that he disagreed with his attorney's waiver or that he was prevented from testifying. Davis has failed to rebut the state courts' findings of fact with clear and convincing evidence.

Finally, having failed to establish the merits of the underlying ineffective assistance of trial counsel and trial court error claims, Davis likewise fails to establish that his appellate counsel was ineffective in failing to raise the denial of Davis's right to testify during the penalty phase claim on direct appeal. *See United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000)(Appellate counsel is not ineffective for failing to raise meritless claims.).

Davis fails his burden of proving that the state court's determination is an unreasonable application of controlling Supreme Court precedent or an unreasonable determination of the facts. Accordingly, he is not entitled to relief pursuant to Ground One.

GROUND TWO

Davis was denied his due process rights under the Sixth and Fourteenth Amendments of the United States Constitution because trial counsel was ineffective in failing to present any evidence or expert testimony on the issue of Mr. Davis having suffered post traumatic stress due to extensive sexual abuse (Petition, pp. 13-15 (Doc. 1); Memo, pp. 14-16 (Doc. 2)).

Davis asserts that his defense attorneys were ineffective in failing to retain a qualified

mental health expert to provide expert testimony during the penalty phase of the trial regarding

Davis having suffered post traumatic stress as a result of sexual abuse he suffered as a child.  In

affirming the trial court's rejection of this claim, the Florida Supreme Court thoroughly discussed

the evidence presented during the penalty phase and that presented during the post-conviction

evidentiary hearing:

> In his second claim of ineffective assistance of penalty phase counsel, Davis argues that his trial counsel was ineffective for failing to present in mitigation the testimony of a qualified expert that Davis suffered from post-traumatic stress syndrome due to sexual abuse suffered by him as a child and while in prison. Specifically, he alleges that the expert presented on this issue was not qualified to render an opinion on the relationship between sexual abuse and post-traumatic stress disorder.

> In denying this claim, the trial court found:

>> Maslanik testified that Dr. McClane did testify during the penalty phase on Post Traumatic Stress Disorder. The Court finds that Dr. McClane testified that Davis was diagnosed with PTSD. McClane also described to the jury the effects of PTSD. Maslanik testified that he believed Dr. McClane's overall qualifications would qualify him to render an opinion on PTSD. Additionally, Dr. Harry Krop, PhD testified that Davis was diagnosed with PTSD and described PTSD to the jury. Accordingly, this claim is DENIED.

> We have recognized that"the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated." *State v. Lewis*, 838 So. 2d 1102, 1113 (Fla. 2002). "An attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence." *Ragsdale v. State*, 798 So. 2d 713, 716 (Fla. 2001) (quoting *State v. Riechmann*, 777 So. 2d 342, 350 (Fla. 2000)).

> In determining whether the penalty phase proceedings were reliable, "the failure [of counsel] to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so." When evaluating claims that counsel was ineffective for failing to present mitigating evidence, this Court has phrased the defendant's burden as showing that counsel's ineffectiveness "deprived the defendant of a reliable penalty phase proceeding."

*Asay v. State*, 769 So. 2d 974, 985 (Fla. 2000) (citations omitted). Moreover, as the Supreme Court recently stated in *Wiggins v. Smith*, 539 U.S. 510, 156 L. Ed. 2d 471, 123 S. Ct. 2527 (2003):

> [O]ur principal concern in deciding whether [counsel] exercised "reasonable professional judgmen[t]" is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable. In assessing counsel's investigation, we must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seems "from counsel's perspective at the time."

Id. at 2536 (citations omitted) (third alteration in original).

In contrast to *Wiggins*, where counsel's proffered mitigation was completely devoid of evidence of the defendant's life history and family background, in this case there was substantial investigation and a comprehensive presentation of evidence during a four-day penalty phase. Davis's defense team presented the testimony of three mental health experts: (1) Dr. Harry Krop, a clinical psychologist with a specialty in child sexual abuse and an expert in forensic psychology, (2) Dr. Henry Dee, a neuropsychologist and an expert in pediatric neuropsychology and substance abuse, and (3) Dr. Thomas McClane, a psychiatrist and expert in the area of forensic psychiatry and pharmacology. All three mental health experts reviewed extensive background information provided to them by Davis's defense lawyers, including photographs of the victim and the crime scene, the transcripts and audiotapes of two statements made by Davis after he was arrested, jail medical records, other police and arrest reports of Davis's, beginning with juvenile records, Davis's HRS records, psychological evaluations done at Peace River Developmental Center, high school records including two psychological evaluations done by members of the school board, and medical and psychiatric records from the Department of Corrections. The experts also reviewed the arrest reports and Florida Department of Law Enforcement (FDLE) records of Davis's stepfather, Brad Hudson, and FDLE and police reports of Eddie Arnold Davis, Davis's biological father. Finally, the mental health experts also either interviewed or reviewed depositions of various people related to the case, including Davis's two aunts, mother, half sister, grandmother, father, stepmother, and stepfather.

Dr. Krop performed neuropsychological testing and a psychosexual evaluation on Davis and testified during the penalty phase that Davis had suffered from physical abuse as a child and had a problem with excessive drinking. Dr. Krop diagnosed Davis with six different mental health disorders--dysthymia, substance abuse, post-traumatic stress disorder, learning disability, borderline personality disorder, and antisocial personality disorder. Dr. Dee corroborated Dr. Krop's testimony that Davis was physically abused as a child and had moderate to severe problems with alcohol, and testified that he was aware of the allegations of sexual abuse contained in Davis's prison's records. Both Dr. Dee and Dr. Krop evaluated Davis prior to trial.

Dr. McClane evaluated Davis after Davis was found guilty but before the beginning of the penalty phase. During this evaluation Davis disclosed for the first time that he was sexually abused by his stepfather, Brad Hudson, sometime between the ages of eleven and thirteen. Dr. McClane testified during the penalty phase that this abuse would have had a "serious effect on the development of a child" and had a "profound effect" on Davis. Dr. McClane diagnosed Davis with five mental health disorders. Dr. McClane's primary diagnosis was post-traumatic stress disorder based on the incidents of sexual abuse, followed by chronic alcohol dependence and intoxication at the time of the offense, borderline intellectual functioning, borderline personality disorder, and antisocial personality disorder.

During cross-examination, the State attempted to attack the credibility of Dr. McClane by focusing on the fact that he was not specially trained in the area of sexual abuse of children. Davis argues that Dr. McClane's testimony that Davis suffered from post-traumatic stress syndrome due to sexual abuse as a child was significantly undermined by this cross-examination. Davis contends that trial counsel should have secured an expert in child sexual abuse to testify that Davis was being truthful when he revealed that he suffered from sexual abuse as a child and that Davis suffered from post-traumatic stress as a result of that abuse.

At the postconviction hearing, Davis presented the testimony of Dr. Sherri Bourg-Carter, a psychotherapist with specialties in forensic psychology and child sexual abuse. Dr. Bourg-Carter testified that she believed Davis was telling the truth as to his allegations of child sexual abuse and diagnosed him as suffering from post-traumatic stress disorder based on this abuse. Dr. Bourg-Carter based her diagnosis on an interview with Davis, the results of psychological tests she administered to him, prior psychological exams done on Davis, Department of Corrections records, and the transcript testimony of Dr. Krop and Dr. McClane at the penalty phase. Dr. Bourg-Carter further testified that Dr. Krop could have been qualified as an expert in child sexual abuse and wondered why Dr. McClane interviewed Davis as to the sexual abuse instead of Dr. Krop. Finally, Dr. Bourg-Carter testified that she thought Dr. Krop should have been alerted to the sexual

abuse after reviewing the records. In Dr. Bourg-Carter's opinion, there were certain "red flags" in the record that Davis was possibly a victim of sexual abuse, including the nature of the crime itself--the murder of a young girl.

We conclude that Davis's argument that counsel was ineffective in not securing the testimony of an expert such as Dr. Bourg-Carter is without merit. First, trial counsel's performance was not deficient. This Court has found counsel's performance deficient where counsel "never attempted to meaningfully investigate mitigation" although substantial mitigation could have been presented. *See Rose v. State*, 675 So. 2d 567, 572 (Fla. 1996); *see also Wiggins*, 123 S. Ct. at 2542 (failing to uncover substantial mitigating evidence, including sexual abuse, due to inattention is deficient performance and not reasoned strategic judgment). However, in this case, Davis's trial counsel did conduct a thorough background investigation and present substantial mental health mitigation, including the testimony of three mental health experts, who diagnosed Davis with no less than six different mental health disorders. Thus, this case is more like Asay, where we concluded that trial counsel was not deficient where the defendant had been examined prior to trial by mental health experts and the defendant was simply able to secure a more favorable diagnosis in postconviction. *See Asay*, 769 So. 2d at 985.

"In evaluating the *Strickland* prong[] of deficiency. . ., it is [also] important to focus on the nature of the mental mitigation [the defendant] now claims should have been presented." *Rutherford*, 727 So. 2d at 223. In this case, Davis is offering no new mental mitigation testimony. Nor did the postconviction expert rely on information not previously available at trial. n8 Rather, the testimony of Dr. Bourg-Carter presented at the evidentiary hearing is similar to the penalty phase testimony of Dr. McClane. Both mental health experts diagnosed Davis as suffering from post-traumatic stress disorder based on incidents of child sexual abuse. Dr. Krop diagnosed Davis as suffering from post-traumatic stress as a result of physical abuse suffered as a child. Although Dr. Bourg-Carter may be characterized as a "more favorable mental health expert" in that she has substantial expertise in child sexual abuse and its relationship to post-traumatic stress disorder, Davis's trial counsel was not deficient simply because Davis was able to secure a "more favorable" report on postconviction. *Asay*, 769 So. 2d at 986.

> n8 In fact, Dr. Bourg-Carter conceded during the postconviction proceedings that she actually reviewed less prior history than either Dr. Dee or Dr. Krop and would not have been qualified with what she reviewed to testify comprehensively in a penalty phase.

Even if counsel was deficient for not having an expert specifically trained in child sexual abuse examine Davis after Davis revealed incidents of sexual abuse, Davis

is unable to demonstrate prejudice. As noted above, both Dr. Krop and Dr. McClane testified that Davis suffered from post-traumatic stress syndrome. Consistent with this diagnosis and the other multiple diagnoses of the experts, the trial judge found in his sentencing order that the mitigating factor of extreme mental or emotional disturbance was established and stated that

> it is apparent to this Court the defendant came from a dysfunctional family; the defendant is an alcoholic, with low self-esteem; the defendant had an abused, neglected childhood; the defendant has had learning disabilities, which he has overcome; the defendant is immature for his age; the defendant may have an anti-social personality disorder; *the defendant may have suffered from post-traumatic stress disorder*; the defendant has suffered from chronic depression and anxiety; the defendant has poor impulse control and defective judgment at times and the defendant has suffered from attention deficit hyperactivity disorder. The Court is reasonably convinced this mitigating factor exists and *gives it great weight*.

(Emphasis supplied.) Thus, there was extensive mental health testimony presented during the penalty phase and the trial judge gave the statutory mitigator of extreme emotional disturbance great weight. Davis cannot establish prejudice such that our confidence in the outcome is undermined. Therefore, we affirm the denial of relief on this claim.

*Davis v. State*, 875 So. 2d at 369-372.

The state courts cited the prevailing law [*Strickland*] and applied it to the facts of this case. Davis fails to carry his burden under the AEDPA on this claim. Davis has not shown that the state courts' resolution of this claim was contrary to controlling Supreme Court precedent or an unreasonable application of established constitutional law. The record reflects that Davis's attorneys conducted a thorough background investigation, presented the testimony of three mental health experts who diagnosed him with no less than six different mental health disorders, including post- traumatic stress syndrome. Dr. Dee and Dr. Krop testified as to Davis's physical abuse as a child, and Dr. McClane testified as to Davis's sexual abuse as a child. Moreover,

counsel cannot be considered ineffective merely because during the post-conviction proceedings,

Petitioner was able to obtain a more favorable opinion from an expert in the field of post-

traumatic stress disorder based on incidents of child sexual abuse. *See Davis v. Singletary*, 119

F.3d 1471, 1475 (11th Cir. 1997)(mere fact a defendant can find, years after the fact, a mental

health expert who will testify favorably for him does not demonstrate counsel was ineffective for

failing to produce that expert at trial). Furthermore, the Florida Supreme Court found that Davis

failed to demonstrate prejudice because the state trial judge found that the mitigating factor of

extreme mental or emotional disturbance was established, found that Davis had an abused

childhood and suffered from post-traumatic stress syndrome, and gave great weight to the

mitigating factor. Petitioner has not demonstrated that the Florida Supreme Court's

determination was either contrary to or an unreasonable application of clearly established federal

law, or was based on an unreasonable determination of the facts in light of the evidence.

Accordingly, Ground Two is denied.

GROUND THREE
Davis was denied his constitutional rights under the Fifth, Sixth, and Fourteenth Amendment of
the United States Constitution because the trial court erred in denying Davis's claim that trial
counsel was ineffective by failing to present the defense of voluntary intoxication as a valid
defense to first degree murder (Petition, pp. 16-17 (Doc. 1); Memo, pp. 17-18 (Doc. 2)).

Davis asserts that there was evidence presented at trial that he had been drinking heavily

and was highly intoxicated on the night of the offense. It appears that Davis argues that trial

counsel was ineffective in failing to present expert testimony that Davis lacked the specific intent

required for the charge of first-degree murder based on intoxication, and in failing to request a

jury instruction on voluntary intoxication. The state trial court denied this claim, stating:

> Davis claims that his trial counsel did nothing in the guilt phase to present

actual evidence of the Defendant lacking the specific intent required for a finding of guilt on the charge of first-degree murder due to his voluntary intoxication. Davis claims that there was overwhelming evidence that he was intoxicated at the time of the murder, and that he was entitled to a jury instruction on voluntary intoxication.

Maslanik conceded that voluntary intoxication is a defense to first-degree premeditated murder, and that calling an expert for that defense would not have been inconsistent with the penalty phase. However, Maslanik testified that he did present evidence of Davis' intoxication, but felt that the voluntary intoxication instruction creates too high a standard to be able to say someone was intoxicated to the extent that it negates intent. Maslanik also testified that Davis was charged with other general intent crimes, and the Court would have to instruct the jury that the defense of voluntary intoxication would not apply to those offenses. Maslanik testified that he presented evidence of Davis' intoxication and believed the jurors would more readily accept that argument that Davis' mental state was diminished by alcohol, and would not apply it as technically as they would with an instruction.

Even though counsel's failure to ask for an instruction on voluntary intoxication could be characterized as ineffective, the evidence was such that if an instruction had been given, there is not a reasonable probability that the result would have been different. See Strickland v. Washington. 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). This claim is therefore DENIED.

(C5, 704-5).

On appeal from the denial of post-conviction relief, the Florida Supreme Court affirmed the state trial court, stating:

Davis argues that his trial counsel was ineffective for "failing to present the defense of voluntary intoxication as a valid defense to first-degree murder." Although it is uncontested that there was abundant evidence presented during the guilt phase of trial by both the State and the defense that Davis was intoxicated at the time of the offense, Davis specifically argues that his trial counsel failed to either present actual evidence in the form of an expert opinion, or request a jury instruction that Davis lacked the specific intent required for a finding of guilt on the charge of first-degree murder due to his voluntary intoxication, or both.

This Court has stated that "[c]ounsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions. Moreover, strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of

professional conduct." *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000) (citations omitted). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Rolling v. State*, 825 So. 2d 293, 298 (Fla. 2002) (quoting *Strickland*, 466 U.S. at 689).

At the evidentiary hearing, Davis presented the testimony of Dr. Michael Maher, an expert in forensic psychiatry, who testified that in his opinion Davis was sufficiently intoxicated at the time of the offense that his capacity to commit premeditated acts of murder was very substantially impaired. Austin Maslanik, Davis's lead counsel, testified that he did not request a specific instruction on voluntary intoxication for four specific reasons, including the fact that Davis gave two very detailed confessions of the crime which would tend to undermine an argument that Davis was seriously impaired. This view of the evidence is set forth in the trial judge's sentencing order:

> The evidence was that the defendant had been drinking the afternoon before the murder. . . . The barmaid . . . testified that the defendant did not appear to be intoxicated. [She] was the last objective person to see the defendant before the murder and her testimony, in the opinion of this Court, was believable. The Court, however, believes the defendant was somewhat intoxicated, but not to the point it affected his actions and knowledge.

> The defendant left the bar and decided to burglarize the victim's home in hope of finding more beer money as he stated in both of the taped confessions. The defendant unscrewed the front porch light bulb so no one would see him enter. When the defendant turned on the light in the master bedroom he was surprised to find the victim. He stated in his second taped confession he could not turn the light off before the victim saw him. At this time the defendant's intent changed. . . . The defendant stated in his second taped confession that he placed his hand over the victim's mouth, told her to be quiet and led her out of the house, while stuffing a rag in her mouth. He then either took her directly to the curtilage of the Moose Club (taped confession # 1) or to his trailer (taped confession # 2) where he brutally and forcefully raped her. The defendant had the state of mind not to rape her in her house but to take her to another location. All of this is noted in both taped confessions which give exacting detail beyond one in an intoxicated blackout . . . . In fact the defendant described in detail how he forcefully penetrated the victim's vagina with his two fingers. He also described how he beat her, held her down, placed plastic over her mouth and nose for a couple of minutes, while the victim ripped at the plastic and tried to get away.

> The defendant then made a conscious, knowing, decision to take the

lifeless body, boost it over the dumpster (taped confession # 1) and shut the lid (taped confession # 2). . . .

This Court allowed the defendant's attorney to argue this statutory mitigator to the Court, but the facts of this case, the defendant's statements and actions show there was no mental disturbance interfering or obviating the defendant's knowledge of right or wrong.

We conclude that this case is similar to *Stewart v. State*, 801 So. 2d 59 (Fla. 2001), where we rejected a claim that trial counsel was ineffective for not pursuing a voluntary intoxication defense. In so doing, we noted that during the evidentiary hearing Stewart's trial counsel testified that his conversations with the defendant persuaded him that an involuntary intoxication defense would not be appropriate due to Stewart's detailed account of the crime and the State's potential use of experts who examined Stewart to determine his competency to stand trial. *See id.* at 65. The Court concluded that the record of both the evidentiary hearing and trial demonstrated that trial counsel made an informed and reasoned decision not to pursue a voluntary intoxication defense for strategic reasons. See id. at 65. Similarly, in *Occhicone*, 768 So. 2d at 1048, and *Johnson v. State*, 593 So. 2d 206, 209 (Fla. 1992), the Court rejected claims that counsel was ineffective for not pursuing an intoxication defense where defendant had good recall of what transpired on the night of the murders and, therefore, was not intoxicated to the level of not being able to premeditate the murders.

Similar to the defendants in *Stewart*, *Occhicone*, and *Johnson*, in this case Davis gave two taped, detailed confessions as to the circumstances of the crime that substantially undermined the viability of a voluntary intoxication defense. The testimony of defense counsel and the record of the confession in this case provide competent, substantial evidence to support the trial court's findings that Maslanik made an informed and strategic decision not to pursue an intoxication defense. Thus, counsel was not deficient and Davis is not entitled to relief on this issue.

Moreover, even if counsel's performance was deficient, we note that there was a general verdict in this case and the evidence supported an instruction on felony murder based on sexual battery, which is a general intent crime to which voluntary intoxication is not a defense. Therefore, even if the jury had been instructed on voluntary intoxication as a defense to premeditated murder, because the general verdict did not differentiate between premeditated murder and felony murder, Davis cannot establish prejudice. *See Sochor v. State*, 619 So. 2d 285, 290 (Fla. 1993) (rejecting claim that trial court committed fundamental error by not instructing the jury on voluntary intoxication as a defense to felony murder based on kidnapping, based in part on the fact that there was sufficient evidence of sexual battery, a general intent crime to which voluntary intoxication is not a defense). Therefore, the trial court did not err in denying this claim.

*Davis v. State*, 875 So. 2d 359, 365-367 (Fla. 2003).

Initially, it is apparent from the record that trial counsel's failure to request a jury instruction on voluntary intoxication was a strategic decision. During the post-conviction hearing, Attorney Maslanik gave four specific reasons for not pursuing a jury instruction on voluntary intoxication: 1) the jury instruction on voluntary intoxication creates too high a standard to be able to say someone was intoxicated to the extent that it negates intent; 2) the voluntary intoxication defense did not apply to the general intent crimes Davis was charged with, i.e., kidnapping and sexual battery, and it would allow the State to argue Davis was guilty of felony murder; 3) he believed that it was better to present evidence of Davis's intoxication and that the jurors would more readily accept the argument that Davis's mental state was diminished by alcohol, and would not apply it as technically as they would with an instruction on voluntary intoxication; and 4) the State could have used the fact that Davis gave detailed confessions of the crime to argue Davis was not sufficiently intoxicated (C4, 529-31).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable..." *Crawford v. Head*, 311 F.3d 1288, 1298 (11th Cir. 2002) (quoting *Strickland*, 466 U.S. at 690-91). In light of the record, including Davis's two detailed confessions, it is objectively reasonable to conclude that at least one reasonably competent attorney such as Davis's counsel could and would forego pursuit of a voluntary intoxication defense and jury instruction in his case. The record does not show that on the date of the offense Davis was intoxicated to the extent required to support a successful defense of voluntary intoxication in Florida. *See Linehan v. State*, 476 So.2d 1262, 1264 (Fla. 1985)(The court emphasized that a defendant who asserts the defense of voluntary intoxication must

establish "evidence of intoxication at the time of the offense sufficient to establish that he was unable to form the intent necessary to commit the crime charged.").  As the Florida Supreme Court found, Davis's ability to describe in detail the circumstances of the crime, a reason Attorney Maslanik gave for not pursuing a jury instruction on voluntary intoxication, undermined any argument that he was seriously impaired.  *See Davis v. State*, 875 So.2d at 367.

Moreover, in Florida, voluntary intoxication is a defense only to crimes requiring specific intent. *See Leschka v. State*, 691 So.2d 535 (Fla. 2d DCA 1997).  "[V]oluntary intoxication is not a defense to any felony-murder[.]" *Linehan v. State*, 442 So.2d 244, 254 (Fla. 2d DCA 1983). As the Florida Supreme Court found, because the evidence at trial supported felony murder based on Davis's sexual battery on the victim, a general intent crime, Davis cannot show prejudice as a result of counsel's decision not to pursue a voluntary intoxication defense or request a jury instruction on voluntary intoxication.  *See Davis v. State*, 875 So.2d at 367.

Having thoroughly considered the record and the applicable law, the Court finds that the state courts' denial of Petitioner's ineffective assistance of counsel claim is not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).  Simply put, counsel's strategic trial decisions are entitled to a strong presumption of reasonableness.  Davis has not overcome that presumption.  *See, Strickland,* 466 U.S. at 689-90; *see also, Bell v. Cone*, 535 U.S. 685, 698 (2002)(a court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance).

GROUND FOUR

Davis was denied his rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution because the trial court refused to suppress statements made to law enforcement authorities which were illegally obtained (Petition, pp. 17-23 (Doc. 1); Memo, pp. 18-30 (Doc. 2)).

Davis contends that the trial court erred in failing to suppress statements he made to law enforcement on March 18, 1994 and May 26, 1994 because: 1) the deputies were required to advise him of his *Miranda* rights before they questioned him on March 18th because he was in custody at the time of the questioning; 2) deputies failed to comply with the requirements of Florida Rules of Criminal Procedure, Rule 3.111; 3) Major Judd initiated the conversation with Davis, and Major Judd knew his comments to Davis were likely to elicit a response from Davis; 4) even if Davis initiated the conversation with Major Judd, he still should have been given *Miranda* warnings prior to being interviewed; and 5) his taped statement after he was given *Miranda* warnings was tainted by his earlier statements.

Davis raised this claim on direct appeal. In denying the claim, the Florida Supreme Court stated:

> As his first issue, Davis contends that the trial court erred in admitting the statements he made to law enforcement officers on March 18 and May 26. We address the statements made at each stage separately. First, with respect to the statements Davis made at the police station on March 18 before he was arrested, the trial court found that whether a Miranda violation had occurred was moot because Davis had not made any incriminating statements during that interview. However, *Miranda* prohibits the use of all statements made by an accused during custodial interrogation if the accused has not first been warned of the right against self-incrimination and the right to counsel. n2 Thus, statements obtained in violation of *Miranda* are inadmissible, regardless of whether they are inculpatory or exculpatory.
>
> n2 *In Miranda*, the Court said:

The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to "admissions" of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory." If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.

384 U.S. at 476-77.

Nevertheless, we uphold the admissibility of Davis's prearrest statements on a different basis. *Miranda* warnings are required whenever the State seeks to introduce against a defendant statements made by the defendant while in custody and under interrogation. Absent one or the other, *Miranda* warnings are not required. *Alston v. Redman*, 34 F.3d 1237, 1243 (3d Cir. 1994) (citing *Miranda*, 384 U.S. at 477-78); *Sapp v. State*, 690 So. 2d 581 (Fla. 1997); *see also Rhode Island v. Innis*, 446 U.S. 291, 300, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980) ("It is clear that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."). Although custody encompasses more than simply formal arrest, the sole fact that police had a warrant for Davis's arrest at the time he went to the station does not conclusively establish that he was in custody. Rather, there must exist a "restraint on freedom of movement of the degree associated with a formal arrest." *Roman v. State*, 475 So. 2d 1228, 1231 (Fla. 1985). The proper inquiry is not the unarticulated plan of the police, but rather how a reasonable person in the suspect's position would have perceived the situation. Id.

The circumstances of this case lead us to conclude that Davis was not in custody

at the time he made the prearrest statements. Police had questioned Davis several times prior to March 18. At least once he had gone to the police station voluntarily for questioning and was permitted to leave. It is therefore unlikely that a reasonable person in Davis's position would have perceived that he was in custody until he was formally arrested. In any event, any error in admitting these prearrest statements was harmless. Davis did not say anything during the prearrest interview that he had not already said to police on previous occasions.

Next we address the admissibility of the untaped confession Davis made to Major Judd and Lieutenant Schreiber while in the holding cell. Davis points out that because he had invoked his right to counsel upon being arrested (and the trial court found that he had), police were prohibited under *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981), from interrogating Davis unless he reinitiated contact. According to Davis, Judd's expression of his disappointment in Davis constituted initiation of contact by police in violation of *Edwards*. The trial court made a finding that Major Judd's statement did not constitute interrogation as defined in *Inni*s and *Arizona v. Mauro*, 481 U.S. 520, 95 L. Ed. 2d 458, 107 S. Ct. 1931 (1987). We agree with the trial court's analysis and result. First, Judd's statement was not an express questioning of Davis. Second, Judd's statement was not the functional equivalent of express questioning because there was no allegation or showing in the record that the statement was reasonably likely to elicit an incriminating response from Davis based on his emotional or mental state. *See Mauro*, 481 U.S. at 526-27; *Innis*, 446 U.S. at 300-301. Moreover, although Judd eventually did ask Davis to repeat himself, thereby asking a question, it was not intended to elicit an incriminating response. For all Judd knew, Davis could have been asking for a drink of water; surely Judd was permitted to ascertain what Davis had said.

Alternatively, Davis argues that even if he reinitiated contact, Judd should have given him *Miranda* warnings before interviewing him in the holding cell, pursuant to *Kight v. State*, 512 So. 2d 922 (Fla. 1987); *disapproved on other grounds, Owen v. State*, 596 So. 2d 985 (Fla. 1992). In *Kight*, the Court held that a defendant who reinitiated contact with police after having invoked his Fifth Amendment right to counsel was entitled to a fresh set of *Miranda* warnings before being interrogated. *Id*. at 926. Yet, this Court later held in *Christmas v. State*, 632 So. 2d 1368 (Fla. 1994), that where the defendant who was in custody voluntarily initiated a conversation with law enforcement officers in which the defendant provided information about the case, *Miranda* warnings were not required.

Although in this case Major Judd did not read Davis his *Miranda* rights as they are usually set forth, the record shows that as soon as Judd understood that Davis was making statements about the murder, Judd explained to Davis that he would have to reinitiate contact with police because he had asked for a lawyer.

Moreover, when Davis said that he could not afford an attorney, Judd assured him that the State would provide him with one. Therefore, it would be easy to conclude that a formal reading of the *Miranda* warnings was unnecessary. However, the requirement of giving *Miranda* warnings before custodial interrogation is a prophylactic rule intended to ensure that the uninformed or uneducated in our society know they are guaranteed the rights encompassed in the warnings. As far as we can tell, Davis had never been advised of his rights with respect to this case before talking to Judd. Under these circumstances, we are compelled to conclude that Davis's untaped confession to Judd should have been suppressed.

Notwithstanding, the erroneous admission of this confession was harmless beyond a reasonable doubt. Shortly after confessing in his holding cell, Davis gave a taped statement in which he voluntarily gave the same information contained in his prior statement to Judd. This statement was clearly admissible because Davis was fully informed of (and waived) his *Miranda* rights before the start of the taping session. *See Oregon v. Elstad*, 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985) (holding that although defendant's voluntarily given initial statement was inadmissible because of *Miranda* violation, subsequent statement, made after careful *Miranda* warnings were given and waiver was obtained, was admissible).

As to the second taped confession, given on May 26, Davis was not given a fresh set of *Miranda* warnings, although he was reminded of his right to the advice of counsel. However, numerous state and federal courts have rejected the talismanic notion that a complete readvisement of *Miranda* warnings is necessary every time an accused undergoes additional custodial interrogation. *See Brown v. State*, 661 P.2d 1024 (Wyo. 1983), and cases cited therein. Rather than adhere to an overly mechanical application of *Miranda*, we believe that once *Miranda* has been complied with, the better test for admissibility of statements made in subsequent or successive custodial interrogations is whether the statements were given voluntarily. Such an inquiry must consider the totality of the circumstances. We recede from those portions of *Kight* and *Christmas* that may be inconsistent with this analysis.

In this case, Davis had previously received full *Miranda* warnings and he validly waived them. There is no evidence of coercion; in fact, Davis was responsible for initiating the contact that led to this second taped confession. He was once again apprised of his right to counsel. Under these circumstances, we conclude that the second taped confession was voluntary and that the underlying concerns of *Miranda* were fully satisfied. Thus, there was no error in admitting the second taped confession.

*Davis v. State*, 698 So. 2d at 1187-89.

The United States Supreme Court has expressly recognized that the failure to administer *Miranda* warnings initially does not taint all subsequent statements. In *Oregon v. Elstad*, 470 U.S. 298 (1985), the Supreme Court stated:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id*. at 309.

In *Elstad*, the Supreme Court further stated:

> there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.

*Id*. at 318. (footnote omitted). While confessions obtained after technical violations of *Miranda* may be inadmissible because they run afoul of *Miranda's* per se bar, such confessions are not necessarily involuntary and may not taint any subsequent confession. *Elledge v. Dugger*, 823 F.2d 1439, 1443 (11th Cir. 1987).

**1. March 18, 1994 confession**

On March 18, 1994, Davis gave an untaped confession to Major Judd and Lieutenant Schreiber. Davis was never advised of his *Miranda* rights regarding this case before talking to Judd and Schreiber. However, shortly after confessing to Judd and Schreiber, Davis, after being fully informed of and waiving his *Miranda* rights, gave a taped statement to Detectives Smith

and McWaters in which he voluntarily gave the same information contained in his prior

statement to Judd and Schreiber.  Davis argues that Judd and Schreiber's failure to advise Davis

of his *Miranda* rights rendered his initial confession invalid thus tainting his subsequent

confession to Smith and McWaters.

*Elsted* differentiates between an involuntary statement and a statement obtained in

technical violation of *Miranda*:

> There is a vast difference between the direct consequences flowing from coercion
> of a confession by physical violence or other deliberate means calculated to break
> the suspect's will and the uncertain consequences of disclosure of a "guilty secret"
> freely given in response to an unwarned but noncoercive question.

*Id*. at 312.

"Whether [a] confession was obtained by coercion or improper inducement can be

determined only by an examination of all of the attendant circumstances."  *Haynes v.*

*Washington*, 373 U.S. 503, 513 (1963).  After consideration of the circumstances surrounding the

statement made by Davis to Judd and Schreiber, this Court finds no reason to believe that

Davis's statement was involuntary.  There is no evidence of coercive police conduct or improper

inducement. Although Davis was in custody, he was not subjected to any "physical violence or

other deliberate means calculated to break the suspect's will." *Elstad*, 470 U.S. at 312.  Major

Judd's solitary comment to Davis that "he was disappointed in him" cannot be characterized as

coercion or improper inducement.[7]  Therefore, this Court finds that Davis has failed to carry his

burden of demonstrating that at the time of his initial confession to Judd and Schreiber, his will

---

[7]Davis does not allege, and there is no indication from the record, that the officers engaged in the "question first - warn later" interrogation technique prohibited by the Fifth Amendment.  *See Missouri v. Seibert*, 542 U.S. 600 (2004).

was overborne by actions of the law enforcement officers and his capacity for self determination was critically impaired. *See Culombe v. Connecticut*, 367 U.S. 568, 601 (1961). Consequently, Davis's confession to Judd and Schreiber was not involuntary. Therefore, although Davis's initial confession to Judd and Schreiber was in violation of *Miranda*, the confession was voluntary. Accordingly, Davis's second confession to Davis and McWaters, given after Davis was fully advised of his *Miranda* rights and after he waived those rights, was admissible.

Moreover, the Florida Supreme Court correctly found that any error in the admission of Davis's first confession to Judd and Schreiber on March 18, 1994, was harmless in light of Davis's subsequent confession to Detectives Smith and McWaters later that day after Davis was informed of his *Miranda* rights and waived them. The test set forth in *Chapman v. California*, 386 U.S. 18 (1967) requires that "the beneficiary of a constitutional error. . .prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24. This Court is convinced beyond a reasonable doubt that the erroneous admission of Davis's first confession could not have contributed to his conviction. Davis's initial confession to Judd and Schreiber was merely cumulative of the evidence contained in his second confession to Smith and McWaters (See A14, 1562-68; A16, 1839-55). *See Martin v. Wainwright*, 770 F.2d 918 (11th Cir. 1985)(admission of initial voluntary confession obtained in violation of Miranda harmless beyond reasonable doubt where it was merely cumulative of the evidence contained in subsequent confession which did not violate Miranda). Therefore, the Florida Supreme Court's determination was not contrary to or an unreasonable application of clearly established federal law, nor an unreasonable application of the facts in light of the evidence.

**2. May 26, 1994 confession**

To the extent Davis challenges his May 26, 1994 statement to Detective Hamilton,[8] once an accused has invoked his Fifth Amendment rights, he is not subject to further interrogation "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The record supports the state court's finding that before Davis gave his May 26, 1994 statement to Detective Hamilton, Davis initiated contact with the police and wished to speak to them without counsel present (A3, 445-47). However, "[e]ven if a defendant has initiated contact with the police after requesting counsel, any statements made are still inadmissible unless they are the product of a knowing and voluntary waiver." *Dunkins v. Thigpen*, 854 F.2d 394, 397 (11th Cir. 1988). "*Miranda*...does not necessarily require that a suspect be warned anew each time he is questioned." *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005). If, in the totality of the circumstances, a suspect knowingly, intelligently and voluntarily waives his Fifth Amendment rights, a lapse of time between the *Miranda* warnings and the questioning of the suspect will not invalidate the suspect's waiver. See *Jarrell v. Balkcom*, 735 F.2d 1242 (11th Cir. 1984).

Davis previously received the *Miranda* warnings on March 18, 1994. On May 24, 1994, Davis initiated the contact that led to his second taped confession on May 26, 1994.[9] He was apprised of his right to counsel at that time, and there was no evidence that he was coerced into making his statement. The circumstances of this case demonstrate that on May 26, 1994, Davis fully understood both the nature of his Fifth Amendment rights and the consequences of his

---

[8]It is unclear from Davis's petition and memorandum of law whether he is challenging the admission of the May 26, 1994 statement.

[9]On May 24, 1994, Davis signed an "Inmate Interview Request Form" in which he indicated that he wanted a personal interview with Detectives Gilbert and McWaters with the Sheriff's Office (A26, State Exhibit 77).

decision to abandon those rights.  The record demonstrates a knowing and voluntary waiver by Davis of his constitutional rights.

Davis has not carried his burden of proving that the state court's resolution of this claim was an unreasonable application of controlling Supreme Court precedent or an unreasonable determination of the facts. Accordingly, he is not entitled to relief on Ground Four.

GROUND FIVE

Davis was denied his rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution because the trial court denied without a hearing the claim that trial counsel was ineffective for failing to effectively move to suppress Davis's confession or alternatively to argue to the jury as to its inherent unreliability (Petition, pp. 24-25 (Doc. 1); Memo, pp. 18-30 (Doc. 2)).

Davis contends that his confessions were inherently unreliable because he was intoxicated.[10]  He asserts that his attorney, Mr. Maslanik, testified at the evidentiary hearing that the two confessions were "somewhat inconsistent" with the physical evidence.  Mr. Maslanik also testified that he never argued which confession was the correct one.  Davis asserts that trial counsel failed to present evidence of voluntary intoxication, failed to cross-examine witnesses regarding the inconsistent confessions, failed to argue the inherent unreliability of Davis's confessions, and failed to move to suppress the confessions on the basis that they were unreliable. Finally, Davis argues that the state trial court erred in denying a hearing on this ineffective assistance of counsel claim (Petition at pp. 24-25(Doc. 1); Memo at pp. 18-30(Doc.2)).

Initially, to the extent Davis argues that he was denied due process when the state trial

---

[10]It appears from a review of Davis's state 3.850 post-conviction motion that he argues that at the time of his confessions he was taking 125 milligrams of the drug Sinequan, and therefore he was "possibly under the influence of drugs..."  (C2, 316).

court failed to afford him an evidentiary hearing on this ineffective assistance of counsel claim, he is not entitled to federal habeas relief. A federal habeas corpus petition is an inappropriate mechanism by which to challenge the process afforded in a state collateral proceeding because the proceeding is collateral to the prisoner's confinement and not the confinement itself. *Quince v. Crosby*, 360 F.3d 1259, 1261-62 (11th Cir. 2004) ("[W]hile habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief."); *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987) (a habeas claim that the state trial court violated a petitioner's due process rights because it failed to conduct an evidentiary hearing and did not attach to its opinion those portions of the record on which it relied went to issues unrelated to the cause of petitioner's detention and did not state a basis for habeas relief).

Davis raised this claim in his Rule 3.850 motion for post-conviction relief as Ground 1F (C2, 315-18). In denying the claim, the state trial court stated "Claims IA, ID, IF, VII, and XII are denied because the issues raised in those claims are procedurally barred." (C4, 454). In affirming the state trial court's denial of the claim, the Florida Supreme Court stated:

> Davis next argues the trial court erred in not granting him an evidentiary hearing on his claim that trial counsel was ineffective "for failing to argue to the jury as to the inherent unreliability of Davis's confessions." A postconviction defendant is entitled to an evidentiary hearing unless the motion and record conclusively show that the defendant is entitled to no relief. *See Floyd v. State*, 808 So. 2d 175, 182 (Fla. 2002). Although this Court has urged trial courts to err on the side of caution when deciding whether or not to grant an evidentiary hearing on postconviction claims, "[a] defendant may not simply file a motion for postconviction relief containing conclusory allegations that his or her trial counsel was ineffective and then expect to receive an evidentiary hearing." *State v. Coney*, 845 So. 2d 120, 135 (Fla. 2003); *see also Kennedy*, 547 So. 2d at 913. In order for a motion to be facially sufficient, the defendant must allege specific legal and factual grounds that demonstrate a cognizable claim for relief.

This claim was properly denied by the trial court because Davis failed to plead this claim specifically. Davis does not allege in his motion what is inherently unreliable in the two detailed confessions, nor does he direct us to portions of the record where trial counsel failed to effectively cross-examine witnesses on the confessions' inconsistencies. Davis's conclusory allegations that the jury would have reached a different result had trial counsel argued the "inconsistent parts of the confessions" are not supported by a properly pled factual basis. Thus, this claim is facially insufficient and the trial court did not err in summarily denying this claim.

*Davis v. State*, 875 So. 2d at 368.

Respondent argues that the Florida Supreme Court rejected this ineffective assistance of counsel claim on state procedural grounds, and therefore this claim in procedurally barred from federal review. This Court, however, is not so convinced. A federal court may not review a question of federal law decided by a state court if the state court's decision rested on a state law ground, be it substantive or procedural, that is independent of the federal question and adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729, (1991). A federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question. *See Harris v. Reed*, 489 U.S. 255 (1989).

Although the state trial court found Davis's claim was procedurally barred, the Florida Supreme Court affirmed the denial of the claim because it was facially insufficient. The Florida Supreme Court's determination that this ineffective assistance of counsel claim was facially insufficient because it was not supported by a properly pled factual basis is more akin to a ruling on the merits of the claim itself, rather than procedural default.

Nonetheless, this Court finds this ground to be without merit. In evaluating the performance prong of the *Strickland* ineffectiveness inquiry, there is a strong presumption in

favor of competence. The presumption that counsels' performance was reasonable is even stronger since Davis's attorneys were very experienced criminal defense attorneys with substantial experience in death penalty cases.[11] The inquiry is "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. "[H]indsight is discounted by pegging adequacy to 'counsel's perspective at the time' . . . and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (citations omitted). Thus, Davis must establish that no competent attorney would have taken the action that counsel, here, chose. *United States v. Freixas*, 332 F.3d 1314, 1319-20 (11th Cir. 2003).

Here, counsels' performance was not deficient. Counsel moved to suppress the confessions. Davis argues that his attorneys should have argued that the confessions were inherently unreliable because Davis was taking 125 milligrams of Sinequan, an anti-depressant, at the time of the confessions and that he was "possibly under the influence of drugs." At least one competent attorney, under those circumstances, would have refrained from arguing that Davis's confessions were inherently unreliable because he was "intoxicated" as a result of taking his medication. Moreover, to the extent Davis asserts his attorneys' performance was deficient for failing to cross-examine state witnesses regarding inconsistencies in the two confessions,

---

[11]"When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." *Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001); *see Williams v. Head*, 185 F.3d 1223, 1229 (11th Cir. 1999) (noting that "[i]t matters to our analysis" whether the attorney is an experienced criminal defense attorney), *cert. denied*, 530 U.S. 1246 (2000). At the time of Davis's trial, Attorney Maslanik had tried approximately 40 first-degree murder cases, approximately 20 of which were death penalty cases (C4, 526), and he had taught at various seminars on death penalty issues (C4, 527). Attorney Norgard had been a criminal defense lawyer since 1981, tried between 20 and 25 cases where the State sought the death penalty, and had taught courses on defending capital cases since 1988 (C4, 582-83).

Davis does not point to the alleged inconsistencies in the two confessions. Therefore, he fails to demonstrate counsel was ineffective for failing to cross-examine witnesses as to the inconsistencies in the confessions.

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted). Petitioner's attorneys acted reasonably, and it is apparent that Petitioner is merely second guessing them.

Even assuming, arguendo, deficient performance by defense counsel, Davis has not shown prejudice. Davis has not shown that a reasonable probability exists that the outcome of the case would have been different if his attorneys had provided the assistance that Davis has alleged they should have provided. Davis has wholly failed to support his claim that he was intoxicated at the time of the confessions with any evidence. At best, he argues he possibly could have been under the influence of drugs because he was taking his anti-depressant. Nor does he show that any alleged inconsistencies in the confessions rendered them unreliable. Thus, the ineffectiveness claim is without merit.

GROUND SIX

Davis's rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution were denied because the trial court erred in allowing the jury to hear a tape

recording of the 911 call that Beverly Schultz made when she discovered that her daughter was missing (Petition, pp. 25-31(Doc. 1); Memo, pp. 30-32 (Doc. 2)).

Davis argues that admission of the tape recording of Beverly Schultz's 911 call denied him his rights under the Confrontation Clause of the United States Constitution, and denied him his rights to a fair trial and to due process of law. Davis raised this claim in his Initial Brief on direct appeal (A27, 64-74). In rejecting this claim, the Florida Supreme Court stated:

> Davis's second issue is that the trial court erred in allowing the jury to hear a tape of the 911 emergency call Beverly Schultz made after discovering her daughter was missing. At trial the State proffered the tape for the stated purpose of showing Beverly Schultz's distressed state of mind at the time of the call. The State contended that Schultz's state of mind was relevant to rebut any inference that she might have been involved in the murder based on Davis's first taped confession, which implicated her. The State also argued that the tape was admissible as a spontaneous statement or an excited utterance. The trial court admitted the tape, instructing the jury that the tape was not being offered for the truth of the matters asserted in the tape, but only to establish Beverly Schultz's state of mind.
> We find no error in the admission of the tape. In view of Davis's earlier confession implicating Schultz as the instigator of the crime, the tape was relevant to show her genuine concern over the loss of her child. In addition, the tape was admissible as an excited utterance under section 90.803(2), Florida Statutes (1993). *Allison v. State*, 661 So. 2d 889 (Fla. 2d DCA 1995) (tape of 911 call by son upon finding mother dead admissible as excited utterance); *Ware v. State*, 596 So. 2d 1200 (Fla. 3d DCA 1972) (tape of 911 call for help admissible as excited utterance). Moreover, the call was relevant to establish the circumstances of the crime and the time when Kimberly was discovered missing. Even if it could be said that the tape should not have been admitted, the error would be harmless beyond a reasonable doubt.

*Davis v. State*, 698 So. 2d at 1189-90.

To the extent Davis argues that the trial court erred under Florida law in admitting the 911 tape into evidence, his claim is not cognizable in this action. Generally, a claim alleging a violation of state law is not subject to review by a petition for the writ of habeas corpus. *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *McCullough v. Singletary*, 967 F.2d 530, 535-36 (11th

Cir.1992).

Davis's claim that he was denied a fair trial because the trial court admitted the 911 tape

and thereby denied him his rights under the Confrontation Clause is, however, a cognizable

federal claim. The Confrontation Clause of the Sixth Amendment bars admission of testimonial

statements of a witness who does not appear at trial unless he is unavailable to testify, and the

defendant has had a prior opportunity for cross-examination. *Davis v. Washington*, 547 U.S.

813, 821 (2006)(citing *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). Beverly Schultz

testified at trial (A13, 1345-88). Therefore, her statements during the 911 call were not barred by

the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. at 59 n. 9 ("when the declarant

appears for cross-examination at trial, the Confrontation Clause places no constraints at all on

use of his prior testimonial statements"). Moreover, statements made in response to 911

operator's questions are not testimonial hearsay, and not subject to the Confrontation Clause.

*Davis v. Washington*, 547 U.S. at 821-29. Therefore, admission of the 911 tape did not violate

Davis's rights under the Confrontation Clause. Furthermore, because of Davis's confessions, the

admission of the 911 tape was harmless beyond a reasonable doubt. *See United States v.

Edwards*, 211 F.3d 1355, 1359 (11th Cir. 2000)(stating that the harmless error doctrine applies to

violations of the Confrontation Clause). Accordingly, Davis is not entitled to federal habeas

relief pursuant to Ground Six.

GROUNDS SEVEN AND EIGHT

Davis's right to a fair trial pursuant to the Sixth, Eighth, and Fourteenth Amendments of the
Constitution was denied by the State's introduction into the guilt phase of irrelevant matters and
improper displays by state witnesses which the prosecutor exploited. Davis's rights to a fair
penalty phase trial pursuant to the Sixth, Eighth, and Fourteenth Amendments of the Constitution
was denied by the prosecutor's improper argument, cross-examination of witnesses, by the

introduction of irrelevant evidence, and by the trial court's refusal to permit Mr. Davis to present relevant testimony in his defense (Petition, pp. 31-40 (Doc. 1); Memo, pp. 33-40 (Doc. 2)).

Davis essentially asserts that he was denied a fair trial during the guilt and penalty phases of the trial because:

1) the prosecutor asked a prospective juror during voir dire and in the presence of the other prospective jurors whether it would bother her that the case involved a child with a learning disability;

2) the prosecutor referred to the victim's emotional handicap during closing argument where the victim's handicap had not been part of the States' case;

3) of emotional displays by two of the State's witnesses, Beverly Schultz, the victim's mother, and Deputy Terry Storie who found the victim's body;

4) the prosecutor attempted to exploit Deputy Storie's emotionalism during his guilt phase closing argument;

5) during closing argument the prosecutor characterized statements given by Davis in one of his confessions as "bald-faced lies";

6) during closing argument the prosecutor referred to the crime and Davis as "vicious" and "brutal";

7) the trial court, over objection, allowed the prosecutor to cross-examine one of the defense's mental health experts about some hearsay contained in a predisposition report because it was not established that the expert had relied upon the report in rendering his opinion that Davis had been abused as a child;

8) the trial court, over objection, allowed the State during cross-examination of Davis's

grandmother to introduce photographs depicting Davis with long hair and facial hair;

9) the trial court denied Davis's attorneys' request to testify during the penalty phase of the trial regarding their strategy behind their decision not to have Davis examined by Dr. McClane until after Davis was convicted, and to rebut the inference that Davis had no problems controlling his impulses by letting the jury know counsel had to tell Davis on several occasions during the trial to relax and calm down;

10) while cross-examining Dr. McClane, the prosecutor introduced the nonstatutory aggravator of future dangerousness into the penalty phase;

11) during closing argument at the penalty phase, the prosecutor improperly argued that the jury should not be persuaded by any sympathy they felt for Davis, and improperly referred to Davis as "poor little Wayne Davis";

12) the prosecutor improperly told the jury that the under sentence of imprisonment aggravator alone was sufficient for imposing the death penalty;

13) during closing argument at the penalty phase, the prosecutor violated the "golden rule" when he improperly stated "these rules are meant to protect us, the state"; and

14) the cumulative effect of the aforementioned defects denied Davis a fair trial and a fair sentencing determination.

In denying Davis's claims, the Florida Supreme Court stated:

Third, Davis contends that the State improperly injected irrelevant matters and improper argument into the trial and exploited the emotional displays of its witnesses. Davis argues that it was error for the prosecutor (1) to ask a prospective juror during voir dire and in the presence of the other prospective jurors whether it would bother her that the case involved a child with a learning disability; (2) to refer to the victim's emotional handicap during closing argument where the victim's handicap had not been part of the State's case; (3) to refer to the emotional reaction of Detective Storie, who testified to discovering the victim's

41

body; (4) to characterize statements given by Davis in one of his confessions as "bald-faced lies"; and (5) to refer to the crime and its perpetrator as "vicious" and "brutal."

As to asking a prospective juror in front of the others whether it would hinder her impartiality if the case involved a learning disabled child, we find no error. Whether a trial judge should have allowed interrogation of jurors on specific subjects is reviewed under an abuse of discretion standard. *Farina v. State*, 679 So. 2d 1151, 1154 (Fla. 1996). The prospective juror in question had worked with learning disabled children for ten years. The trial court did not abuse its discretion in permitting the prosecutor to voir dire this prospective juror and any of the other prospective jurors on this subject. The prosecutor stated that he intended to establish that Davis had targeted the victim because of her handicap. Ultimately he did not do so, but the trial judge was reasonable at that stage in permitting this question to determine if any of the jurors had strong feelings or biases that would prevent them from rendering an impartial verdict in the case. Moreover, the prosecutor did not dwell on the victim's handicap during voir dire, but rather asked the question and moved on to other areas.

The prosecutor's reference to the victim's emotional handicap in closing argument was not objected to by the defense. Thus the issue is waived. Even if it had been preserved, any error would have been harmless. The prosecutor made mention of the victim's handicap once in passing. If anything, the jury was more focused on the victim's young age than the fact that she may have been handicapped.

We find no error in the trial court's decision to overrule the defense's objection to the prosecutor's reference to Detective Storie as "the guy that got upset thinking about this little girl." The prosecutor was in the middle of making the argument that Davis placed the victim's body in the dumpster to avoid detection. In light of the number of law enforcement witnesses who testified, it is understandable that the prosecutor used this reference as a short-hand method of referring to the detective who discovered the victim's body in the dumpster. There was no undue emphasis on the detective's emotionalism.

Davis also argues that the prosecutor improperly referred to certain statements in Davis's taped confessions as "bald-faced lies," particularly where the State was responsible for admitting those tapes into evidence. We find that the comments did not cross the line into improper argument. When it is understood from the context of the argument that the charge is made with reference to the evidence, the prosecutor is merely submitting to the jury a conclusion that he or she is arguing can be drawn from the evidence. *Craig v. State*, 510 So. 2d 857, 865 (Fla. 1987). It was for the jury to decide what conclusion to draw from the evidence and the prosecutor was merely submitting his view of the evidence to them for consideration. Nor do we agree with the contention that the prosecutor's

characterization of the crime and its perpetrator as "vicious" and "brutal" was improper argument in view of the evidence in the case.

* * *

Sixth, Davis argues that the jury recommendation of death was tainted by a number of trial errors. First, he claims that the trial court erred in permitting the prosecutor to cross-examine one of the defense's mental health experts about some hearsay contained in a predisposition report because it was not established that the expert had relied upon the report in rendering his opinion that Davis had been abused as a child. We disagree. The record shows that defense counsel questioned Dr. Dee on direct examination about the records he had reviewed. When Dr. Dee did not remember seeing any predisposition reports, defense counsel assured Dr. Dee that the predisposition reports were contained in the HRS records he had reviewed. On cross-examination, the prosecutor asked Dr. Dee to read a portion of the predisposition report which referred to an earlier HRS investigation. The report noted that the HRS investigation revealed no physical bruises on Davis and that an unnamed person stated that she had not seen bruises for five years. On redirect examination, defense counsel asked Dr. Dee about another of the predisposition reports, in which the author reported having seen belt marks on Davis in the past. It is clear the predisposition reports were among the records Dr. Dee relied upon in arriving at his opinion that Davis had been the victim of child abuse. We find no abuse of discretion in permitting the prosecutor to cross-examine the expert witness on material contained in the predisposition report. See *Muehleman v. State*, 503 So. 2d 310, 315 (Fla. 1987) (upholding admission into evidence of report constituting hearsay where expert witness considered report in formulating opinion).

Davis also challenges the State's introduction of a photopack photograph admitted during cross-examination of Davis's grandmother, depicting Davis with long hair and facial hair. We find no error. During its direct examination of Davis's grandmother, the defense admitted photographs of Davis as a young boy, thereby making Davis's appearance relevant. The photopack photograph was proper rebuttal to show that Davis no longer looked the same.

Further, Davis challenges the trial court's refusal to permit his attorney to testify. The situation arose when the State cross-examined the defense's mental health expert Dr. McClane about the fact that Davis's lawyers did not permit him to question Davis about the instant crimes and the effect this limitation had on the formulation of his opinions. Defense counsel objected to this questioning on the ground that the limitation imposed on their expert was a legal decision made in the wake of *Dillbeck*.

In *Dillbeck*, our ruling permitting the State to examine the defendant was limited to those situations where the defendant had been interviewed by the defense's mental health expert. Yet that is precisely what happened here. The fact that Davis's lawyers limited the subject matter of the questions that Dr. McClane could ask Davis does not change the fact that Davis was interviewed. The State was permitted to point out any weaknesses in Dr. McClane's testimony due to the restrictions placed on his interview of Davis. Nor was it error to deny defense counsel's request to personally testify in order to explain his strategy to the jury. Defense counsel was permitted on redirect to elicit that the witness's interview was limited in an attempt to insulate Davis from being examined by the State.

Davis also argues that the prosecutor improperly introduced the nonstatutory aggravator of future dangerousness into the penalty phase by stating to Dr. McClane during cross-examination that he couldn't predict "from this point forward" whether Davis would commit a crime such as the one he committed here. We agree that the trial court should have sustained defense counsel's objection. However, this error was harmless. The question was never answered because the court required the prosecutor to rephrase the question. Further, the court also told the jury that they would be instructed on the only aggravating circumstances which could be considered. *See, e.g., Allen v. State*, 662 So. 2d 323, 331 (Fla. 1995) (finding harmless error where the sentencing order specifically provided that the imposition of the death sentence was based solely on the statutory aggravating factors and the trial court did not allow any other aggravating factors to be argued to the jury), *cert. denied*, 134 L. Ed. 2d 477, 116 S. Ct. 1326 (1996).

We reject Davis's contention that the prosecutor improperly misled the jurors into believing that they should not be swayed by any sympathy they felt for Davis. See Valle v. State, 581 So. 2d 40, 46-47 (Fla. 1991). Likewise, we find no merit in the argument that the prosecutor improperly told the jury that the under sentence of imprisonment aggravator alone was sufficient for imposing the death penalty.

*Davis v. State*, 698 So. 2d at 1190-92.

A. Prosecutor's voir dire (sub-claim 1)

Davis asserts that he was denied a fair trial when the prosecutor asked a prospective juror in front of the others whether it would hinder her impartiality if the case involved a learning disabled child. A properly-conducted voir dire can "inform litigants about potential jurors, making reliance upon stereotypical and pejorative notions . . . both unnecessary and unwise," and

"provides a means of discovering actual or implied bias and a firmer basis upon which the parties may exercise their peremptory challenges intelligently." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143-44 (1994). A criminal defendant has the "right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment . . . ." *Uttecht v. Brown*, 551 U.S. 1 (2007).

There was no error in the voir dire examination in this case, much less error of constitutional magnitude.  The prosecutor stated that he intended to establish that Davis had targeted the victim because of her handicap, and it was reasonable to permit the prosecutor to ask the question to determine if any of the jurors had strong feelings or biases that would prevent them from rendering an impartial verdict in the case. Accordingly, the Court finds that the Florida Supreme Court decision was not contrary to, or an unreasonable application of federal constitutional law, nor was it an unreasonable application of the facts.

B. Prosecutor's closing arguments (sub-claims 2, 4-6, 11-13)

Davis claims that he was denied a fair trial and the jury recommendation of death was tainted by comments made by the prosecutor during closing arguments during both the guilt and penalty phases of the trial.  The standard of review of a state prosecutor's closing argument was set forth in *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).  To grant habeas relief, the Court must find that improper closing argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. at 643. The arguments made by the prosecutor during Davis's trial fall far short of this standard. Therefore, the Court finds that the decision of the Florida Supreme Court on these claims is not contrary to, or an unreasonable application of, clearly established federal law.

C. Witnesses' emotional displays (sub-claim 3)

Davis asserts that he was denied a fair trial because of emotional displays[12] during the trial by Beverly Schultz, the victim's mother, and Deputy Storie, the officer who found the victim's body in the dumpster. During the prosecutor's closing argument during the guilt phase of the trial, Davis's attorney moved for a mistrial based, in part, on the emotional displays by Schultz and Storie during their testimony (A17, 2093-97). The trial court denied Davis's motion for mistrial (Id., 2096-97).

"[B]ecause the trial judge is in the best position to assess the prejudicial effect of an emotional outburst, the decision whether to grant a mistrial lies within his sound discretion." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1302 (11th Cir. 2001). Furthermore, the trial court instructed the jury that "[t]his case must not be decided for or against anyone because you feel sorry for anyone, or you are angry at anyone" and "[f]eelings of prejudice, bias or sympathy should not be discussed by you in any way, nor should they play any role in your verdict in this case. Your verdict must be based on your views of the evidence, and the law contained in these instructions." (A18, 2144-45). In sum, Davis wholly fails to demonstrate that the witnesses' emotional reactions rose to the level of constitutional harm, that is, that he was denied a fair trial.

D. Prosecutor's cross-examination of Dr. Dee regarding HRS report (sub-claim 7), and admission of photographs of Davis with long hair and facial hair (sub-claim 8)

Davis asserts that during the penalty phase of the trial, the trial court deprived him a fair sentencing determination by allowing the State to introduce photographs of Davis with long hair and facial hair, and by allowing the prosecutor to cross-examine one of Davis's experts, Dr. Dee, regarding some hearsay contained in a HRS predisposition report. Davis argues that it was

---

[12]Schultz and Storie "became somewhat upset and cried" during their testimony (A17, 2094).

improper to allow the prosecutor to cross-examine Dr. Dee with the report because it was not established that the expert had relied upon the report in rendering his opinion that Davis had been abused as a child. He also argues that the photographs of Davis were irrelevant and did nothing to rebut how Plaintiff looked as a child.[13]

The Florida Supreme Court rejected Petitioner's arguments. It found that the defense made Davis's appearance relevant when it admitted photographs of Davis as a young boy, and the photographs of Davis with long hair and facial hair was proper rebuttal to show that Davis no longer looked the same. Further, it found that the trial court did not abuse its discretion in permitting the prosecutor to cross-examine Dr. Dee on material contained in the predisposition report because the HRS predisposition reports were among the records Dr. Dee relied upon in arriving at his opinion that Davis had been the victim of child abuse.

Federal habeas relief based on a decision to admit evidence can only be granted if the erroneous admission violated Petitioner's federal constitutional rights. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). This requires that the admission of evidence rendered Petitioner's state proceedings fundamentally unfair, i.e., that the wrongly-admitted evidence is a crucial, critical, highly significant factor. *Thigpen v. Thigpen*, 926 F.2d 1003, 1012 (11th Cir. 1991). Nothing in Davis's claims comes close to meeting this standard. Accordingly, the decision of the Florida Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law.

E. Denial of Davis's attorney's request to testify (sub-claim 9)

---

[13]The defense entered into evidence three pictures of Davis as a child (A21, 2647).

Davis asserts that the State was permitted to question one of his experts, Dr. McClane, about the fact that Davis's lawyers did not permit him to question Davis about the crimes and the effect this limitation had on the formulation of his opinions. Davis also asserts that while questioning Dr. McClane, the prosecutor noted that during the trial, Davis never had a single outburst or episode of inappropriate behavior or impulse control. Davis asserts that his attorney wanted to testify in order to explain the legal reasons behind the decision not to have Davis examined by Dr. McClane until after Davis was convicted, and to rebut the inference that Davis had no problems controlling his impulses by telling the jury that counsel had to advise Davis to relax and calm down many times during the trial.

The Florida Supreme Court found that because Davis was interviewed by Dr. McClane, the State was permitted to point out any weaknesses in Dr. McClane's testimony due to the restrictions placed on his interview of Davis. Furthermore, the Florida Supreme Court held that it was not error to deny defense counsel's request to testify in order to explain his strategy to the jury, as defense counsel was permitted on redirect to elicit that the witness's interview was limited in an attempt to insulate Davis from being examined by the State.[14] *Davis v. State,* 698 So. 2d at 1191-92.

The constitution irreducibly protects a criminal defendant's right to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts

---

[14]The Florida Supreme Court did not address Davis's claim that his attorney wanted to testify to rebut the inference that Davis had no problems controlling his impulses.

as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). *See also, Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.").

Nonetheless, a federal court's inquiry into state evidentiary rulings is limited to violations of a federally guaranteed right, *Nordskog v. Wainwright*, 546 F.2d 69, 72 (5th Cir. 1977), such as the denial of fundamental fairness. *Hall v. Wainwright*, 733 F.2d 766, 770 (11th Cir. 1984). The category of infractions that violate fundamental fairness is narrow. *Estelle v. McGuire*, 502 U.S. at 73. Fundamental fairness is violated when the evidence excluded is material in the sense of a crucial, critical, highly significant factor. *Boykins v. Wainwright*, 737 F.2d 1539, 1544 (11th Cir. 1984).

In this case, it cannot be said that Davis's attorney's proffered testimony was material in the sense of being crucial, critical, or highly significant. Moreover, Davis's attorney was permitted on redirect to elicit that Dr. McClane's interview was limited in an attempt to insulate Davis from being examined by the State (A22, 2944-45). Dr. McClane also testified that Davis did not have impulse control problems when he was sober (Id., 2922). Moreover, the trial court found that Davis "has had poor impulse control..." and gave great weight to the mitigating factor that the capital felony was committed while Davis was under the influence of extreme mental or emotional disturbance (C1, 152 - Sentencing Order).

Relief must be denied on this ground. Davis was not prejudiced from the exclusion of his

attorney's testimony judge's evidentiary ruling since the excluded testimony cannot be considered crucial, critical or highly significant. In sum, the exclusion of Davis's attorney's testimony did not affect the fundamental fairness of this trial.

F. Prosecutor's introduction of the nonstatutory aggravator of future dangerousness into the penalty phase (sub-claim 10)

Davis asserts that during cross-examination of Dr. McClane, the prosecutor improperly injected the nonstatutory aggravating circumstance of future dangerousness into the proceedings. He appears to argue that the prosecutor's question[15] suggested to the jury that Davis might commit future acts of violence, and therefore the question was prejudicial and warranted a new trial.

The Florida Supreme Court held that even though the defense's objection should have been sustained, the error was harmless because the prosecutor's question was never answered. The court required the prosecutor to rephrase the question, and instructed the jury that they would be instructed on the only aggravating circumstances which could be considered. *Davis v. State*, 698 So.2d at 1192.

This Court agrees that the prosecutor's question was harmless. When the prosecutor asked the question, defense counsel objected, and the attorneys argued the issue at the bench. The court overruled defense counsel's objection and denied his motion for mistrial, but ordered the prosecutor to rephrase the question and stated that the jury would be instructed on the only aggravators they would be allowed to consider. Dr. McClane never answered the prosecutor's

---

[15]After Dr. McClane testified that had he examined Davis before the murder, he could not have predicted that Davis would have committed the specific acts he did, the prosecutor's question was "[a]nd you can't predict from this point forward. All of these things that you've told this jury about still exist in Mr. Davis, according to you. He suffers from-" (A22, 2923).

question, and the prosecutor moved on to other areas of questioning (A22, 2922-25). The trial court instructed the jury on the limited aggravating circumstances they could consider (A23, 3038-43).

The prosecutor's question did not deprive Davis of a fair sentencing determination. Accordingly, the decision of the Florida Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law.

G. Cumulative effect of errors (sub-claim 14)

Davis summarily asserts that a combination of errors violated his right to a fair trial and sentencing. As all of Davis's individual claims are without merit, his cumulative error claim must fail. *See, e.g., United States v. Taylor*, 417 F.3d 1176, 1183 (11th Cir.), *cert. denied*, 546 U.S. 1047 (2005) ("There being no error in any of the district court's rulings, the argument that cumulative trial error requires that this Court reverse [the defendant]'s convictions is without merit."). *See also, Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) (Petitioner could not obtain habeas relief through aggregation of individual meritless claims he had averred; twenty times zero is zero); *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir.1998) ("Cumulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors."), *cert. denied*, 526 U.S. 1025 (1999); *United States v. Easter*, 66 F.3d 1018, 1023 (9th Cir. 1995) (The court having found no error in the district court's rulings, there is, a priori, no cumulative effect error).

Accordingly, Grounds Seven and Eight do not warrant habeas corpus relief.

GROUND NINE

The trial court erred in subjecting Davis to a compelled mental health examination by a prosecution expert in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution (Petition, pp. 40-41 (Doc. 1); Memo, pp. 40-43 (Doc. 2)).

Davis argues that he is entitled to a new penalty phase trial because the trial court denied him his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments when, over Davis's objections, it compelled him to submit to a mental health examination by the State's mental health expert, Dr. Merin, after the guilt phase of the trial. Dr. Merin testified for the State during the penalty phase of the trial in order to rebut the defense's penalty phase mental health expert testimony.

Davis raised this claim in his Initial Brief on direct appeal (A27, 95-101). In rejecting this claim, the Florida Supreme Court found:

> Davis asserts as his fifth issue that the trial court erred in permitting the State's mental health expert to examine Davis in order to rebut the defense's penalty phase mental health expert testimony. According to Davis, the compelled mental health examination violated his Fifth Amendment right against self-incrimination. In *Dillbeck v. State*, 643 So. 2d 1027 (Fla. 1994), we rejected the same argument. We reasoned that it would be unfair to permit a defendant to present mitigating mental health evidence at the penalty phase while denying the State the opportunity to present evidence on the same issue. This became especially so after our decision in *Nibert v. State*, 574 So. 2d 1059 (Fla. 1990), wherein we held that a trial court must find that a particular mitigating circumstance has been proved whenever the defendant has presented a "'reasonable quantum of competent, uncontroverted evidence'" of that mitigating circumstance. *Dillbeck*, 643 So. 2d at 1030 (quoting *Nibert,* 574 So. 2d at 1062). We also directed the proposal of a new Rule of Criminal Procedure that would permit the State to have its mental health expert examine a defendant who intends to present at the penalty phase the testimony of a mental health expert who has interviewed the defendant. We subsequently adopted such a rule. See Fla. R. Crim. P. 3.202. We therefore reject this argument.

*Davis v. State*, 698 So. 2d at 1191.

Davis is not entitled to relief with respect to this claim. He fails to demonstrate that the Florida Supreme Court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established law as determined by the United States Supreme Court. On any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the applicable "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001).

Davis argues that "conditioning use of expert mental health testimony at the penalty phase upon a compelled exam by the State's mental health expert violates the Fifth and Sixth Amendments to the United States Constitution." (Dkt. 2 at 41). Davis, however, fails to refer the Court to a U.S. Supreme Court decision in support of this claim.[16] Moreover, even if it was error to compel Davis to submit to examination by the State's mental health expert, Davis fails to demonstrate actual prejudice under *Brecht* because the trial judge found that the mitigating factor of extreme mental or emotional disturbance was established and gave this factor great weight. Davis has failed to carry his burden of showing that the Florida Supreme Court's rejection of this claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Accordingly, this claim provides no basis for habeas corpus relief.

---

[16]Davis only cites to *Bradford v. State*, 873 S.W.2d 15 (Tex. Cr. App. 1993) in support of his claim.

GROUND TEN

The trial court erred in overruling Davis's objections to Florida's standard jury instructions on reasonable doubt and premeditated murder in violation of the Sixth, Eight, and Fourteenth Amendments to the United States Constitution (Petition, pp. 41-44 (Doc. 1); Memo, pp. 43-49 (Doc. 2)).

Davis filed written objections to the Florida standard jury instructions on "reasonable doubt" and "premeditated murder" and argued that the instructions were erroneous and inadequate (A1, 151-54). The trial court overruled Davis's objections (A17, 2013-14; 2021-22). At the guilt phase of the trial, the trial court gave the following instructions on "reasonable doubt" and "premeditated murder":

> Whenever the words "reasonable doubt" are used, you must consider the following: A reasonable doubt is not a possible doubt, a speculative, imaginary, or forced doubt. Such a doubt must not influence you to return a verdict of not guilty if you have an abiding conviction of guilt.
>
> On the other hand, if after carefully considering, comparing, and weighing all the evidence there is not an abiding conviction of guilt, or, if having a conviction, it is one which waivers and vacillates, then the charge is not proven beyond every reasonable doubt, and you must find the defendant not guilty because the doubt is reasonable.
>
> It is to the evidence introduced upon this trial and to it alone that you are to look for that proof. A reasonable doubt as to the guilt of the defendant may arise from the evidence, conflict in evidence, or lack of evidence.
>
> If you have a reasonable doubt, you should find the defendant not guilty. If you have no reasonable doubt, you should find the defendant guilty.
>
> * * * *
>
> There are two ways in which a person may be convicted of

first-degree murder; one is known as premeditated murder, and the other is known as felony murder. An indictment for premeditated murder will support a conviction for either premeditated murder or felony murder.

I'm now going to give you the definition and the elements of first-degree murder, premeditated. Before you can find the defendant guilty of first-degree murder, premeditated murder, the State must prove the following three elements beyond a reasonable doubt:

Number one, Kimberly Waters is dead; number two, the death was caused by the criminal act or agency of Eddie Wayne Davis; number three, there was a premeditated killing of Kimberly Waters.

Killing with premeditation is killing after consciously deciding to do so. The decision must be present in the mind at the time of the killing. The law does not fix the exact period of time that must pass before the formation of the premeditated intent to kill and the killing. The period of time must be long enough to allow reflection by the defendant. Premeditated intent to kill must be formed before the killing.

The question of premeditation is a question of fact to be determined by you from the evidence. It will be sufficient proof of premeditation if the circumstance of the killing and the conduct of the accused convince you, beyond a reasonable doubt, of the existence of premeditation at the time of the killing.

(A18, 2130-31; 2140-41).

A. "Reasonable Doubt"

Davis argues that the definition of reasonable doubt in the above instruction is unconstitutional because "it essentially equates the word 'reasonable' with such condemned terms as 'substantial' and 'real.'" He further argues that the "instruction forbids a not guilty verdict on the basis of a 'possible' or 'speculative' doubt, although possibilities and speculation can be reasonable

and prevent the 'subjective state of certitude' required by <u>Winship</u>." [17] In denying Davis's claim, the

Florida Supreme Court stated:

> In his fourth claim, Davis argues that the trial court erred in overruling defense objections to the standard jury instructions on reasonable doubt and premeditated murder. These issues have been resolved adversely to Davis by our prior case law. *Esty v. State*, 642 So. 2d 1074 (Fla. 1994) (reasonable doubt); *Spencer v. State*, 645 So. 2d 377 (Fla. 1994) (premedation).

*Davis v. State*, 698 So. 2d at 1191.

The Court finds that the reasonable doubt jury instruction given in Petitioner's case is

constitutionally acceptable. In a criminal case, the government must prove each element of the crime

charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 361 (1970). Nonetheless, in *Victor

v. Nebraska*, 511 U.S. 1, 5 (1994), the Court held that:

> [t]he beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury."

(Internal citations omitted).

"[T]rial courts must avoid defining reasonable doubt so as to lead the jury to convict on a

lesser showing than due process requires." *Id*. 511 U.S. at 22-23.  When reviewing a reasonable

doubt instruction, the instruction as a whole must be considered to determine if the jury was mislead

as to the government's burden of proof. *See Harvell v. Nagle*, 58 F.3d 1541 (11th Cir. 1995). The

proper inquiry is "whether there is a reasonable likelihood that the jury understood the instructions

---

[17]*In re Winship*, 397 U.S. 358 (1970).

to allow conviction based on proof insufficient to meet the *Winship* standard." *Victor*, 511 U.S. at 6.

The instruction on "reasonable doubt" used in this case properly informed the jury of the state's burden of proof and the standard to be used by the jury in making their decision. The instruction did not include any language that could possibly have led the jury to convict Davis on a lesser showing of proof. Moreover, the Court disagrees with Davis that the terms used in the instruction equate "reasonable" with "substantial" and "real."

B. "Premeditated Murder"

It appears that Davis's argument here is that the instruction on "premeditated murder" failed "to instruct the jury correctly as to what the state must prove in order to obtain a conviction." (Memo at pp. 45-46 (Doc. 2)). Initially, in his memorandum of law Davis simply recites the state court's instruction on premeditated murder, then concludes that "[i]t is fundamental error to fail to instruct the jury correctly as to what the state must prove in order to obtain a conviction." (Id.). Davis's conclusory assertion is rejected. He does not argue or show how the jury instruction on "premeditated murder" failed to correctly instruct the jury as to what the state was required to prove. Vague and conclusory claims failing to state facts which would show an entitlement to relief can be dismissed without further effort by the Court. *Blackledge v. Allison*, 431 U.S. 63 (1977). *See also, Caderno v. United States*, 256 F.3d 1213, 1217 (11th Cir. 2001) (noting that habeas relief is not warranted when claims are merely conclusory allegations unsupported by specifics).

Secondly, Davis's claim is without merit. Section 782.04(1)(a), Florida Statutes (1993), defines premeditated first-degree murder as the unlawful killing of a human being when perpetrated from a premeditated design to effect the death of the person killed or any human being. The Florida

Supreme Court has explained "premeditated design" as:

> a fully formed and conscious purpose to take human life, formed upon reflection and deliberation, entertained in the mind before and at the time of the homicide. The law does not prescribe the precise period of time which must elapse between the formation of and the execution of the intent to take human life in order to render the design a premeditated one; it may exist only a few moments and yet be premeditated. If the design to take human life was formed a sufficient length of time before its execution to admit of some reflection and deliberation on the part of the party entertaining it, and the party at the time of the execution of the intent was fully conscious of a settled and fixed purpose to take the life of a human being, and of the consequence of carrying such purpose into execution, the intent or design would be premeditated within the meaning of the law although the execution followed closely upon formation of the intent.

*McCutchen v. State*, 96 So. 2d 152, 153 (Fla. 1957). The instruction given in Davis's case addressed all of the points discussed in *McCutchen*. Accordingly, the jury was properly instructed on the element of premeditated design.

Finally, Davis cannot show he was prejudiced as a result of the premeditated design instruction. As the Florida Supreme Court noted, there was a general verdict in this case and the evidence supported an instruction on felony murder based on sexual battery. *Davis v. State*, 875 So. 2d at 367. As such, any error in instructing the jury on premeditated murder was necessarily harmless. *See Jones* v. State, 748 So.2d 1012, 1024 (Fla. 1999) ("[E]ven if the evidence does not support premeditated murder, any error in charging the jury on that theory is harmless where the evidence supports a conviction for felony murder, which has also been charged.").

Davis fails his burden of proving that the state court's determination of this claim is an unreasonable application of controlling Supreme Court precedent or an unreasonable determination of the facts. Accordingly, Ground Ten does not merit habeas corpus relief.

GROUND ELEVEN

Davis's rights under the Eighth and Fourteenth Amendments of the United States Constitution were denied because the trial court refused his request to instruct the jury on specific nonstautory mitigating circumstances and that unanimous agreement was not required for consideration of mitigating factors (Petition, pp. 44-45 (Doc. 1); Memo, pp. 49-51 (Doc. 2)).

Davis asserts that during the penalty phase of the trial, he requested: 1) a jury instruction which listed 24 specific mitigating factors for the jury to consider; and 2) a jury instruction which stated "unanimity is not required for the finding of a mitigating circumstance; each juror may individually determine whether he or she believes a mitigating circumstance exists." The trial court denied both of Davis's requested jury instructions. Davis argues that the "denial of the requested instructions created a substantial risk that the jury conducted its deliberations on mitigating circumstances improperly. This, in turn, rendered the jury's recommendation of the death sentence constitutionally unreliable." (Dkt. 2 at 51). Accordingly, he argues, the death sentence imposed on him violated the Eighth and Fourteenth Amendments.

Davis raised this claim in his Initial Brief on direct appeal (A27, 111-117). In rejecting this claim, the Florida Supreme Court found:

> As his seventh point, Davis argues that the trial court erred in denying his proposed jury instructions on nonstatutory mitigating factors. We have repeatedly ruled that the standard jury instructions are sufficient. The trial court acted within its discretion to deny a special instruction. *E.g., Kilgore v. State*, 688 So. 2d 895 (Fla. 1996); *Ferrell v. State*, 653 So. 2d 367, 370 (Fla. 1995), *cert. denied*, 137 L. Ed. 2d 341, 117 S. Ct. 1262 (1997); *Gamble v. State*, 659 So. 2d 242, 246 (Fla. 1995), *cert. denied*, 133 L. Ed. 2d 860, 116 S. Ct. 933 (1996). For the same reason, we reject Davis's argument that the trial court should have given an instruction that unanimous agreement was not required for the consideration of mitigating factors.

*Davis v. State*, 698 So. 2d at 1192.

Under Florida Supreme Court precedent, there is no requirement that the trial court give

specific instructions on nonstatutory mitigating circumstances urged by the defendant. *See, e.g., Jones v. State*, 612 So.2d 1370, 1375 (Fla. 1992), cert. denied, 510 U.S. 836 (1993); *Robinson v. State*, 574 So.2d 108, 111 (Fla.), *cert. denied*, 502 U.S. 841 (1991). Under the Eighth and Fourteenth Amendments, a sentencing body "may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). It is not enough "simply to allow the defendant to present mitigating evidence to the sentencer." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). To "ensure 'reliability in the determination that death is the appropriate punishment in a specific case,'" the jury "must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime." *Id*. at 328 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)) (plurality). *Lockett* and its progeny merely require, however, that a defendant be allowed to present all mitigating evidence and that the sentencer not be precluded from considering this evidence. Accordingly, under *Lockett*, to prevail on his claim that the trial court erred in failing to instruct the jury on the nonstatutory mitigating factors, Davis must establish either that the jury was instructed not to consider -- and therefore could not consider -- nonstatutory mitigating evidence, or that the trial court limited itself solely to a consideration of statutory mitigating factors in fashioning its sentence.

Trial counsel did introduce evidence supporting nonstatutory mitigating aspects of his character. Nothing in the record indicates that the trial court instructed the jury not to consider that evidence of those nonstatutory mitigating factors. In fact, the trial court judge instructed the jury, in pertinent part, as follows:

60

If you find that the aggravating circumstances do not justify the death penalty, your advisory sentence should be one of life imprisonment without possibility of parole for 25 years.

Should you find sufficient aggravating circumstances do exist, it will then be your duty to determine whether mitigating circumstances exist that outweigh the aggravating circumstances. Among the mitigating circumstances you may consider, if established by the evidence, are:

One; the crime for which the defendant is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance.

Two; the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.

Three; any other aspect of the defendant's character or record, and any other circumstance of the offense.

Each aggravating circumstances must be established beyond a reasonable doubt before it may be considered by you in arriving at your decision.

If one or more of the aggravating circumstances are established, you should consider all the evidence tending to establish one or more mitigating circumstances, and give that evidence such weight as you feel it should receive in reaching your conclusion as to the sentence that should be imposed.

A mitigating circumstance need not be proven beyond a reasonable doubt by the defendant. If you are reasonably convinced that the mitigating circumstance exists, you may consider it as established.

The sentence that you recommend to the Court must be based upon the facts as you find them from the evidence and the law. You should weigh the aggravating circumstances against the mitigating circumstances, and your advisory sentence must be based on these considerations.

(A23, 3039-41).

The jury was at liberty to consider -- in addition to the statutory factors -- "any

aspect" of Davis's character, based on the evidence presented during the guilt or sentencing phases

of the trial. Clearly, the jury was not prevented from considering nonstatutory mitigating evidence.

Nor was the jury instructed that it could not consider nonstatutory mitigating evidence. The Constitution requires only that the jury be permitted to consider such evidence. That it did not accept this evidence does not render the resulting advisory verdict of death unconstitutionally infirm. *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992). Consideration of such factors is "sufficient to satisfy the dictates of the Eighth Amendment." *Blystone v. Pennsylvania*, 494 U.S. 299, 308 (1990).

Davis fails to show that he has an Eighth Amendment right to the jury instructions he requested, or that the circumstances of this case demonstrate that the jury's sentence of death was unreliable. Davis has not cited any Supreme Court or other federal precedent that was unreasonably applied or is contrary to the Florida Supreme Court's disposition of this claim. Accordingly, the Court concludes that this claim lacks merit.

GROUND TWELVE

The evidence was insufficient to support the aggravating circumstance that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest, and this factor was submitted to Davis's jury upon an inadequate instruction in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution (Petition, pp. 46-47 (Doc. 1); Memo, pp. 51-54 (Doc. 2).

Davis argues that there was insufficient evidence supporting the aggravating circumstance that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest. He also argues that the jury instruction on this aggravating circumstance was inadequate to guide the jury in their deliberations. In denying Davis's claim, the Florida Supreme Court found:

> Eighth, Davis attacks both the jury instruction on the avoid arrest aggravator and the sufficiency of the evidence in support thereof. The trial court gave the following instruction for this aggravator: "The crime for which the defendant is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest, or effecting an escape from custody." Davis argues that because the victim in this case was not a law enforcement officer, the jury should have been instructed that they could find this aggravator only if the State had proven beyond a reasonable doubt that the

dominant or only motive for the killing was elimination of the witness. In support of this argument, he cites to our decisions holding that in order for this aggravator to be established where the victim is not a law enforcement officer, the State must clearly show that the dominant or only motive for the killing was witness elimination. E.g., *Robertson v. State*, 611 So. 2d 1228, 1232 (Fla. 1993); *Jackson v. State*, 599 So. 2d 103, 109 (Fla. 1992); *Jackson v. State*, 575 So. 2d 181, 190 (Fla. 1991). However, not every court construction of an aggravating factor must be incorporated into a jury instruction defining that aggravator. See Jackson v. State, 648 So. 2d 85, 90 (Fla. 1994) (qualifying that not every aggravating factor necessarily requires instruction that incorporates judicial interpretation of that factor). In *Whitton v. State*, 649 So. 2d 861, 867 n.10 (Fla. 1994), *cert. denied*, 133 L. Ed. 2d 59, 116 S. Ct. 106 (1995), we stated that, unlike the heinous, atrocious, or cruel statutory aggravator, the avoid arrest statutory aggravator did not contain terms so vague as to leave the jury without sufficient guidance for determining the absence or presence of the factor. The challenged instruction was therefore legally adequate.

Nor do we agree with the claim that there was insufficient evidence to establish the avoid arrest aggravator. Davis likens the circumstances of this case to those in *Doyle v. State*, 460 So. 2d 353 (Fla. 1984), where the Court struck down the avoid arrest aggravator. However, Davis stated in his confession that when Kimberly Waters awoke to find Davis in the bedroom, he placed a rag in her mouth to keep her quiet. He transported her to his trailer in a nearby trailer park where he sexually abused her. Davis admitted that he didn't want anybody to know that he had done something like that. He killed her by striking her with his fist and holding a piece of plastic over her mouth. He also admitted that he put her in the dumpster to enable him to get away before her body could be found. These circumstances more closely resemble cases in which we have upheld this aggravator. *See Swafford v. State*, 533 So. 2d 270, 276 (Fla. 1988); *Cave v. State*, 476 So. 2d 180, 188 (Fla. 1985); *Routly v. State*, 440 So. 2d 1257, 1264 (Fla. 1983).

*Davis v. State*, 698 So. 2d at 1193.

Deference must be given to the Florida courts' application of its own law, including the application of the "avoid arrest" aggravator. *See Funchess v. Wainwright*, 772 F.2d 683, 692 n. 9 (11th Cir. 1985). The state trial court's sentencing order clearly sets out the facts that supported a finding for the "avoid arrest" aggravator (Dkt. 18, Ex. A5 at pgs. 742-43). The Florida Supreme Court specifically found that Davis admitted that he didn't want anybody to know that he had sexually molested the victim, and that he also admitted that he put her in the dumpster to enable him

to get away before her body could be found.  *See Davis v. State*, 698 So. 2d at 1193.  The Florida

Supreme Court's findings are supported by the record and entitled to deferential review under § 2254.

Furthermore, federal habeas corpus review is especially limited when reviewing the propriety

of jury instructions from a state trial.  *Agan v. Vaughn*, 119 F.3d 1538, 1545 (11th Cir. 1997) ("Our

limited role on habeas review, when faced with a challenge to a state law jury charge, is to determine

whether any error or omission in the jury charge was so prejudicial as to amount to a violation of due

process."), *cert. denied*, 523 U.S. 1023 (1998).

Davis has not cited any United States Supreme Court case with materially indistinguishable

facts, and Davis has failed to demonstrate that the Florida Supreme Court's ruling was contrary to

or an unreasonable application of any clearly established federal law.  There was no due process

violation and Petitioner has not shown that his right to a fair trial was undermined.  *See Lewis v.*

*Jeffers*, 497 U.S. 764, 780 (1990)("[F]ederal habeas review of a state court's application of a

constitutionally narrowed aggravating circumstance is limited, at most, to determining whether the

state court's finding was so arbitrary or capricious as to constitute an independent due process or

Eighth Amendment violation.").  Based on the evidence, a rational fact finder could have found the

existence of the "avoid arrest" statutory aggravator.  *Lewis v Jeffers*, 497 U.S. at 781 (in determining

whether a state court's application of its constitutionally adequate aggravating circumstance was so

erroneous as to raise an independent due process or Eighth Amendment violation, the appropriate

standard of review is the "rational factfinder" standard).  Accordingly, Petitioner is not entitled to

relief pursuant to Ground Twelve.

GROUND THIRTEEN

The trial court erred in instructing Davis's jury at penalty phase that they could consider that Davis was under sentence of imprisonment as an aggravating circumstance, and in finding this aggravator to exist in the sentencing order, where Davis was on control release at the time of the homicide. The error violated Davis's rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution (Petition, pp. 48-49 (Doc. 1); Memo, pp. 54-56 (Doc. 2)).

Davis argues that at the time of his crimes he was on control release from prison, and that the trial court erred in finding that his control release status qualified him for the aggravating circumstance that "the capital felony was committed by a person under sentence of imprisonment or placed on community control." The trial court found the aggravator applicable in his sentencing order.

Davis raised this ground in his Initial Brief on direct appeal (A27, 122-26). In denying this claim, the Florida Supreme Court found:

As his ninth issue, Davis contends that the trial court erred in finding that his control release status supported the finding that he was under a sentence of imprisonment at the time of the murder. We have not ruled on this precise issue before. In *Straight v. State*, 397 So. 2d 903 (Fla. 1981), this Court held that evidence that the defendant was on parole at the time of the murder supported a finding that the defendant was under a sentence of imprisonment for purposes of this aggravator. Later, in *Haliburton v. State*, 561 So. 2d 248, 252 (Fla. 1990), we found that this aggravator also included situations where the defendant had been out on mandatory conditional release. We based our reasoning on language in the mandatory conditional release statute stating that a person under mandatory conditional release was subject to all statutes relating to parole. On the other hand, in *Bolender v. State*, 422 So. 2d 833 (Fla. 1982), this Court held that probation did not qualify for the under sentence of imprisonment aggravator because the defendant was not incarcerated. In *Trotter v. State*, 576 So. 2d 691, 694 (Fla. 1990), we applied the same reasoning to hold that community control did not satisfy this aggravator.

Davis posits that control release is similar to community control and therefore does not qualify as a "sentence of imprisonment" under the reasoning of *Trotter*. He distinguishes control release from parole by pointing out that only inmates who are

ineligible for parole may qualify for control release. He further distinguishes the two by pointing out that, unlike parole violators, those who have their control release revoked are not entitled to credit for time spent out of prison. However, both of these arguments tend to suggest that control release is even more restrictive than parole.

We find that *Haliburton* governs this issue because control release is most like parole. Like parole, control release is provided for under chapter 947, Florida Statutes (1993). That chapter creates the Parole Commission and sets forth its powers and duties, including administration of both the parole and control release programs. In contrast, probation and community control are housed under a separate chapter and fall under court supervision. The similarities between parole and control release are greater than their differences. We therefore hold that a defendant under control release at the time he or she committed the murder was under a sentence of imprisonment for purposes of section 921.141(5)(a).

*Davis v. State*, 698 So.2d at 1193-94.

The issue of whether Davis, who was on control release at the time he committed the murder, was "under a sentence of imprisonment" is purely an issue of Florida law. Federal habeas relief is available to correct only those injuries resulting from a violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A state's interpretation of its own laws provides no basis for federal habeas relief since no question of a constitutional nature is involved. *See Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983) (per curiam). Accordingly, Ground Thirteen does not warrant habeas corpus relief.

GROUND FOURTEEN

The Florida death penalty statute as applied is unconstitutional under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution based on the holding in *Ring v. Arizona*, 536 U.S. 584 (2002) (Petition, pp. 49-50 (Doc. 1); Memo, p. 56 (Doc. 2)).

Davis argues that Florida's death penalty sentencing scheme violates *Ring v. Arizona*, 536

U.S. 584 (2002).[18] (Petition, pp. 49-50 (Doc. 1); Memo at 56 (Doc. 2)). Petitioner raised this claim in his petition for writ of habeas corpus in the Florida Supreme Court.  In denying Davis's *Ring* claim, the Florida Supreme Court found:

> Davis argues that Florida's death penalty statute, section 921.141, Florida Statutes (2003), is unconstitutional based on *Apprendi* and *Ring*. We note that Davis's death sentence is supported by both the "committed during the course of a kidnapping and sexual battery" aggravator and a unanimous death recommendation. We have denied relief in direct appeals where there has been a prior violent felony aggravator. *See Duest v. State*, 855 So. 2d 33, 49 (Fla. 2003); *see also Doorbal v. State*, 837 So. 2d 940, 963 (Fla. 2003) (stating that prior violent felony aggravator based on contemporaneous crimes charged by indictment and on which defendant was found guilty by unanimous jury "clearly satisfies the mandates of the United States and Florida Constitutions"). We have also denied relief to postconviction defendants raising this issue. *See Jones v. State*, 855 So. 2d 611, 619 (Fla. 2003); *Bottoson v. Moore*, 833 So. 2d 693 (Fla.), *cert. denied*, 537 U.S. 1070, 123 S. Ct. 662, 154 L. Ed. 2d 564 (2002); *King v. Moore*, 831 So. 2d 143 (Fla.), *cert. denied*, 537 U.S. 1067, 123 S. Ct. 657, 154 L. Ed. 2d 556 (2002). Davis is not entitled to relief on this issue.

*Davis v. State*, 875 So. 2d at 374.

Initially, reliance on the *Ring* decision is barred by the nonretroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). *See Schriro v. Summerlin*, 542 U.S. 348, 358 (2004)("*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review."). Accordingly, since Davis's convictions and sentence became final in 1997, prior to *Ring*, Davis cannot pursue a claim under *Ring*.  Secondly, Davis was found guilty by a unanimous jury of the contemporaneous crimes that supported the "prior violent felony" aggravator. As the Florida Supreme Court noted, this circumstance "clearly satisfies the mandates of the United States and

---

[18]In *Ring*, the United States Supreme Court held unconstitutional the Arizona capital sentencing statute to the extent that it allowed a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty.

Florida Constitutions."

ACCORDINGLY, the Court **ORDERS** that:

1. That Davis's petition for writ of habeas (Dkt. 1) corpus is denied.

2. The Clerk is directed to enter judgment against Davis and to close this case.

**DONE AND ORDERED** in Tampa, Florida, on *March 30th*_____, 2009.


_____
JAMES D. WHITTEMORE
UNITED STATES DISTRICT JUDGE

SA:sfc

Copy furnished to:
Counsel of Record